Exhibit 2

1

```
 1

 2                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF NEW YORK
 3
     - - - - - - - - - - - - X
 4
     UNITED STATES OF AMERICA,    :
 5                                           CR-00-196
                                  :
 6          -against-                    United States Courthouse
                                  :      Brooklyn, New York
 7    FRANK COPPA, ET AL,

 8
            Defendants.
 9                                :      February 2, 2001 2000
                                         Ten o'clock a.m.
10    - - - - - - - - - - - - - X
                         TRANSCRIPT OF PROCEEDINGS
11              BEFORE THE HONORABLE I. LEO GLASSER
                    UNITED STATES DISTRICT JUDGE
12    APPEARANCES:

13    For the Plaintiff:      LORETTA E. LYNCH
                              United States Attorney
14                            BY:  ERIC CORNGOLD
                              Assistant United States Attorney
15                            One Pierrepont Plaza
                              Brooklyn, New York 11201
16

17    For the Defendants:     MICHAEL ROSEN, ESQ
                              For Defendant Garafola
18
                              J. BRIAN HANSBURY, ESQ.
19                            For Defendant Montevecchi

20                            JOSEPH GIANNINI, ESQ.
                              For Defendant Persico
21
                              ANDREW WEINSTEIN, ESQ.
22                            For Defendant Cioffoletti

23                            JEFFREY LICHTMAN, ESQ.
                              MIRANDA FRITZ, ESQ.
24                            For Defendant Lev

25                            THOMAS ROTH, ESQ.
                              For Defendant Ray
```

HOLLY DRISCOLL, CSR      OFFICIAL COURT REPORTER

2

```
 1

 2    A P P E A R A N C E S:   (Continued.)

 3                            RICHARD W. BREWSTER, ESQ.
                              For Defendant Lombardo
 4
                              DAVID SMITH, ESQ.
 5                            For Defendant Basile

 6                            JOSEPH BENFANTE, ESQ.
                              For Defendant Temperino
 7

 8

 9    Court Reporter:         Holly Driscoll
                              225 Cadman Plaza East
10                            Brooklyn, New York
                              718-260-2469
11

12
      Proceedings recorded by mechanical stenography, transcript
13    produced by computer.

14

15

16                  *    *    *

17

18          THE CLERK:  Criminal motions, USA versus Ernest

19    Montevecchi, Daniel Persico, John Cioffoletti, Edward

20    Garafola, Daniel Lev, Eugene Lombardo, Lawrence Ray and

21    Abraham Salaman,

22          Counsel, please state your appearances.

23          MR. ROSEN:  Good morning, Your Honor, Michael Rosen

24    for Mr. Garafola.

25          MR. BENFANTE:  Joseph Benfante for Mr. Temperino.
```

RJN 00  000104  102212

JA 242

3

 1          MR. LICHTMAN:  Jeffrey Lichtman and Miranda Fritz for

 2    Mr. Lev.

 3          MR. WEINSTEIN:  Andrew Weinstein for Mr. Cioffoletti

 4    appearing on behalf of Mr. LaRossa.

 5          MR. BREWSTER:  Richard Brewster on behalf of Eugene

 6    Lombardo.

 7          MR. ROTH:  Thomas Roth on behalf of Mr. Ray.

 8          MR. HANSBURY:  Brian Hansbury on behalf of

 9    Mr. Montevecchi.

10          MR. SMITH:  David Smith on behalf of Rocco Basile.  I

11    would just like the record to be clear we are not officially

12    retained for this case.  I am appearing to inform Your Honor

13    as to what will happen in Mr. Basile's other case, he has

14    another indictment and in that case we've reached an

15    agreement, he will be entering a plea of guilty next Wednesday

16    in front of Judge Pollak.  So, I am appearing here to inform

17    Your Honor that is going to happen in the other case, it will

18    be covering this case and I just want Your Honor to be aware

19    of that.

20          THE COURT:  Well, is Mr. Basile contemplate retaining

21    you for this case?

22          MR. SMITH:  Your Honor, he has, although until the

23    plea is actually entered into we have not been formally

24    retained for this case.  I believe once the plea has been

25    entered, we'll be retained for this case and the other as

HOLLY DRISCOLL, CSR        OFFICIAL COURT REPORTER

4

1   well.  We are counsel of record for the other case.

2          THE COURT:  Does Mr. Basile contemplate appearing pro

3   se in the interim?

4          MR. SMITH:  I suppose he could, Your Honor, he is

5   here today.

6          THE COURT:  Would you appear temporarily for

7   Mr. Basile?

8          MR. SMITH:  Yes, Your Honor, I will appear for the

9   purposes of this proceeding today in this matter.

10         THE COURT:  Do we have any other appearances that

11  have to be noted?

12         MR. CORNGOLD:  Eric Corngold for the government,

13  Your Honor.

14         THE COURT:  All right.  I take it everybody is

15  ready --

16         MR. GIANNINI:  Joseph Giannini for Daniel Persico,

17  Jr.

18         THE COURT:  Do we have everybody now?

19         THE CLERK:  Larry Berman had called, he will not be

20  present today but he had joined in the motions.

21         THE COURT:  What I think would be a sensible way of

22  proceeding would be to deal with the motions which raise

23  discrete issues, for example, with respect to the money

24  laundering counts.  I think I'm correct in saying that the

25  motions relating to the money laundering counts were filed by

HOLLY DRISCOLL, CSR        OFFICIAL COURT REPORTER

5

1   Mr. Cioffoletti, Mr. Lev and Mr. Montevecchi.  Why don't we

2   deal with those counts and then we can proceed to the others

3   so we don't have everybody standing around with respect to

4   motions that they have no interest in or haven't made.

5          So, why don't we proceed in that fashion, why don't

6   I hear the money laundering counts, the motions filed by

7   Mr. Cioffoletti, Mr. Lev and Mr. Montevecchi.  I'll hear

8   the movants, I'll hear the government in response with respect

9   to those and then we'll move on to the next one.

10         MR. ROSEN:  Could I make a personal request, Your

11  Honor, I don't mean to interfere with my colleagues.  I have a

12  medical situation uptown at around 11:30, 12:00, so if I could

13  be taken next in order on Mr. Garafola's motions, I would

14  personally appreciate it.

15         THE COURT:  Well, as I understand it, Mr. Garafola's

16  motions are simply a motion to sever.

17         MR. ROSEN:  Correct.

18         THE COURT:  And you want a suppression?

19         MR. ROSEN:  Yes, sir, so I'll be prepared to argue

20  those.

21         THE COURT:  Well, there are a couple of severance

22  motions, Mr. Lev, Mr. Nagel and Mr. Ray made severance

23  motions.  We can do those first and then we can move to the

24  money laundering.

25         MR. ROSEN:  Well, I appreciate that.

HOLLY DRISCOLL, CSR        OFFICIAL COURT REPORTER

6

1          THE COURT:  Okay.

2          MR. CORNGOLD:  Judge, could I ask if I could sort of

3    move closer towards the center and use the podium.

4          THE COURT:  Why don't we hear the severance motions

5    of Mr. Lev, Mr. Garafola, Mr. Nagel and Mr. Ray.

6          MR. BENFANTE:  Your Honor, the other counsel will

7    stand back?

8          THE COURT:  Yes.

9          Mr. Rosen, do you want to start?

10          MR. ROSEN:  Yes, I'd like to, Your Honor, please and

11    most respectfully, I've put in papers suggesting that the law

12    is very clear in this case of Mr. Garafola that he should be

13    considered in Your Honor's sound discretion for getting a

14    severance but it starts with the fact that he's not even

15    properly joined, most respectfully, under Rule 8 in that as I

16    understand Rule 8, that you have to be indicted, the counts

17    that you're in have to have some connection or relationship,

18    as the rule says, if they are alleged to have participated in

19    the same series of acts or transactions constituting offenses

20    and here if Your Honor looks and you see the chart that we

21    prepared of the indictment, the government prepared of the

22    indictment, Mr. Garafola is in the last two counts, an

23    extortion count and a conspiracy to extort, that has no

24    relationship, in my humble opinion, to the core, the essence

25    of this indictment which is a stock fraud case which basically

HOLLY DRISCOLL, CSR        OFFICIAL COURT REPORTER

7

1   alleges that there were entrepreneurs, that there were

2   brokers, that there were nominees all with the central core

3   purpose in an enterprise which Mr. Garafola is not named in

4   to rig the price of four companies, the stock of those

5   companies, to put this money offshore and then to reap the

6   benefits and there's even some allegation that certain

7   nefarious people are enlisted to offer protection to this

8   enterprise and Mr. Garafola is not even named in that.  He's

9   on the back end in Counts Nineteen and Twenty I believe in

10  some discrete and different allegation.

11      And just under Rule 8 there is no connection in fact

12  or in law, certainly not in the indictment, Judge Glasser,

13  that links this conduct of Mr. Garafola to the securities

14  fraud.  He's not named as having any interest in the

15  companies, he's not named as a nominee or that he's going to

16  get a piece of the pie.  Everyone else -- I'm not saying the

17  allegations are true but they did not make any such

18  allegations against Mr. Garafola.  He's off there, you know,

19  in the back discretely and I referred, of course, in my papers

20  to Your Honor's decision in Upton and to Judge Block's

21  decision in Montgomery that sets forth the eight criteria.

22      I'm not just moving, Judge Glasser, because there

23  will be a disparity of proof, there clearly will be where

24  maybe Mr. Garafola's trial could last three days or five days

25  or one week and doesn't need, notwithstanding Mr. Corngold's

HOLLY DRISCOLL, CSR        OFFICIAL COURT REPORTER

8

1    stretch, all this talk about securities fraud and offshore
2    accounts and brokers and, my goodness, this is -- and I hate
3    to say this but this is a garden variety stock fraud with a
4    little bit of alleged organized crime but Mr. Garafola is not
5    named in that part of the indictment that says people from
6    organized crime, these buzz words, were used to protect this
7    enterprise.  He's not even named in that and he's not even
8    named in the enterprise, so I think even under Rule 8 and I
9    think that gets me somewhere, under Zafiro because Zafiro
10   assumes that you're properly joined under Rule 8 and I say
11   Counts -- what is it, Nineteen and Twenty.

12          THE COURT:  Yes.

13          MR. ROSEN:  Sir, are not properly joined certainly as
14   to Mr. Garafola and the cases, the two cases that the
15   government cites in its brief, I think it is the Scarpa case
16   and I think this Court is pretty familiar with most of these
17   citations, you're talking about somebody that's an integral
18   part of the central core of the crime.  Here Mr. Garafola has
19   no connection in this indictment with what this case is about
20   and that's stock fraud.

21          Judge, what that brings me to and I guess there's
22   always a first even after 36 years, I did not receive the
23   motions made by Mr. Roth, my co-counsel, who represents
24   Mr. Ray, I didn't know until last week or the week before that
25   Mr. Ray has made a motion for also a severance claiming that

HOLLY DRISCOLL, CSR        OFFICIAL COURT REPORTER

9

1  he is a government informant or was a government informant and
2  that my client allegedly threatened his life.  I learned that
3  when I read Mr. Corngold's answer to the motions and I
4  wondered, well, what's going on here.  I called Mr. Roth, he
5  was very gracious and he faxed me and sent me his motion
6  papers.  They were filed I think in November, I got them last
7  week.  Clearly, Your Honor, if you want to talk about trial
8  rights or prejudice under trial rights, clearly if Mr. Ray and
9  Mr. Garafola are left in this case, they just can't go to
10 trial together.

11         It looks like from Mr. Roth's moving memorandum that
12 Mr. Ray contemplates taking the stand, defending himself and
13 testifying that Mr. Garafola put a contract out on him which
14 is his position, certainly nothing we acknowledge or agree
15 with but I didn't brief that extensively because I just didn't
16 know about it and I'm not blaming anybody but that's just the
17 way it happened.  I don't know if there is a policy of not
18 advising co-counsel whose client you've accused of having put
19 out a contract, maybe you don't send him the papers but I
20 didn't get the papers.  Again, I'm not blaming Mr. Roth, he's
21 been very cooperative with me since I learned it.  At least
22 now I can stand before this Court and say clearly there should
23 be a consideration, the Court should exercise its discretion
24 and sever Mr. Garafola if there's going to be any proof at a
25 trial that Mr. Garafola allegedly put out a contract, as

HOLLY DRISCOLL, CSR        OFFICIAL COURT REPORTER

10

1  Mr. Ray so succinctly puts it in his moving affidavit.

2          So, I think, Judge, you have the papers and we've

3  taken a lot of time in graphically showing where Mr. Garafola

4  is and isn't and you probably hear this all the time, I'm sure

5  you do, everybody wants a severance. Well, I understand that

6  but it's not a severance in terms of, well, it's easier to get

7  acquitted, it is a severance because he doesn't belong in a

8  securities fraud indictment sitting maybe for a couple of

9  months when there's vast testimony about money laundering

10  which he's not charged with, securities fraud which he's not

11  charged with, RICO which he's not charged with, etc. You've

12  heard it before but this is maybe one of the first times that

13  I really feel candid about saying this to this Court, he just

14  doesn't belong in here under either Rule 8 or Rule 14.

15          And just on the back part of the motions that I made,

16  the motion for suppression, you've read the papers on that. I

17  thought Your Honor signed an order, I may be mistaken, I don't

18  think so. I thought Your Honor did sign an order, that's what

19  I just want to call to the Court's attention, and I have it,

20  perhaps it got lost in the shuffle, Your Honor, but my belief

21  is that Your Honor signed an order on November 28, 2000, a

22  scheduling order setting down a suppression hearing and I

23  thought, not that I'm asking for it today for several reasons

24  but I thought I had gotten to the initial stage where we were

25  going to have a hearing.

HOLLY DRISCOLL, CSR        OFFICIAL COURT REPORTER

11

1      I think that if Your Honor has some trepidation about

2  that, I can articulate again why I think under this unusual

3  circumstance we should have a hearing even though it is a

4  consensual tape and I've never done that before, move to

5  suppress a consensual tape but I've just learned, again, maybe

6  I'm just not in the loop as I used to be, Judge Glasser, but I

7  just learned that there are extensive electronic surveillance

8  of Mr. Garafola that I haven't been afforded and I'm going to

9  talk to Mr. Corngold about that, I'm not going to waste

10  everybody's time but, again, it may be that may have been the

11  source of how come this agent and this undercover happened to

12  show up where Mr. Garafola was one morning.

13      But I think the question of severance, Judge, is

14  paramount in my mind at this moment and I would ask Your Honor

15  if you have any questions about our application for the

16  severance, I think in my brief career this is the best factual

17  and legal basis I've seen for a severance in a case such as

18  this.   Thank you, Your Honor.

19      THE COURT:  Mr. Corngold, do you want to respond when

20  all the severance motions are made or do you want to respond

21  to each as they're made?

22      MR. CORNGOLD:  Let me respond, I think it actually

23  makes sense to respond particularly to Mr. Garafola's

24  severance motion, though I do think that the issues that the

25  other defendants raise touch on that.

HOLLY DRISCOLL, CSR          OFFICIAL COURT REPORTER

1        If the Court will indulge me, let me just take a
2   minute or two to describe how the U.S. Bridge of New York
3   fraud evidence and money laundering evidence fits together and
4   fits in with Mr. Garafola, the charges against Mr. Garafola.
5   The U.S. Bridge of New York was one of the four say central
6   securities manipulation, securities fraud that are charged in
7   this indictment that this enterprise is alleged to have
8   manipulated and then laundered the proceeds of.  The U.S.
9   Bridge of New York is owned by Mr. Polito who the indictment
10  alleges is a Gambino associate and the government would prove
11  that he's closely connected to Mr. Garafola who is a Gambino
12  soldier.  Mr. Polito owns the company, as the indictment
13  alleges; Mr. Lombardo, another defendant in the case who's
14  alleged to be a Bonanno associate, brought Mr. Ray in to the
15  deal, to the conspiracy.  The idea was that to facilitate the
16  U.S. Bridge of New York manipulation, to make it a stock that
17  could be sold and could be manipulated, there was the idea
18  that it would be useful to have bonding.  U.S. Bridge of New
19  York was a construction company and the bonding would permit
20  -- would arguably permit U.S. Bridge of New York to bid on
21  larger contracts.  Mr. Lombardo, the alleged Bonanno
22  associate, brought Mr. Ray in to be bribed, basically to get
23  $100,000 to pay a bribe to achieve the bonding.  Mr. Polito
24  pays the bribe, the U.S. Bridge of New York IPO happens, the
25  manipulation happens but the bonding doesn't occur.  So, what

HOLLY DRISCOLL, CSR        OFFICIAL COURT REPORTER

13

1   happens is, and this is where Mr. Garafola comes into the
2   picture, Mr. Garafola on behalf of Mr. Polito begins to seek
3   to extort Mr. Ray, I mean the White Rock Partners, seeks to
4   get the money back that Mr. Polito spent and there will be
5   evidence about the extortion, that's the last two counts
6   in the indictment, and the events sort of culminate in
7   this meeting at a diner where Mr. Garafola is there and
8   Mr. Garafola's claim to this money, his attempt to extort this
9   money is essentially arbitrated, if you will, by other
10  organized crime figures. Mr. Lombardo is there, the Bonanno
11  associate; Mr. Montevecchi who is alleged to be a Genovese
12  soldier is there representing the White Rock Partners. And
13  the extortion is essentially arbitrated there.

14         Now, why then is this extortion relevant and why is
15  it -- why should it be part of the entire case? Well, it goes
16  to the heart of the U.S. Bridge of New York securities fraud.
17  In order to prove the extortion, we're going to have to show
18  the bribe, the purpose of the bribe, what Mr. Garafola's claim
19  to the money is and how that works, so that's all going to be
20  there. Plus, and this is really maybe the more important
21  point, the indictment as a whole alleges that there's this
22  illegal enterprise and in order for this illegal enterprise to
23  operate, they need the organized crime people who are alleged
24  in the indictment to protect, to arbitrate disputes, to
25  resolve problems because they can't go to the SEC when they've

14

1    got problems, they can't go to the FBI when they've got
2    problems.  So, the indictment alleges a series of times when
3    the White Rock Partners use their organized crime connections,
4    Mr. Coppa, Mr. Montevecchi, Mr. Persico, Mr. Lombardo, to
5    protect them, to arbitrate disputes, to show their power as
6    opposed to the power from the other side.

7           Here Mr. Garafola, who is, as I said, alleged to be a
8    Gambino soldier and that's why this event, this extortion and
9    the resolution of the extortion is at the center of the kind
10   of conduct that goes on in this indictment, it is one of the
11   key moments that these -- that the enterprise needed to use
12   their organized crime associates to resolve the dispute.  So,
13   that's what it is doing there, that's why it meets the
14   requirements of Rule 8.  It's completely tied in to this U.S.
15   Bridge of New York manipulation and that's why, respectfully,
16   we don't believe it makes sense to sever the extortion out.

17          MR. ROSEN:  Can I just say a few words in response?
18   If this alleged extortion is so vital to the U.S. Bridge
19   counts, why isn't Mr. Garafola in the U.S. Bridge securities
20   frauds, conspiracy to commit securities frauds, money
21   laundering of U.S. Bridge funds if it is so vital.  It is not
22   vital.  The IPO was out already.  I mean, in other words, if
23   Mr. Garafola went out and stole a car to get to this meeting,
24   is that part of the conspiracy.  If he's vital, he would be in
25   the enterprise, he would be in the RICO.

HOLLY DRISCOLL, CSR          OFFICIAL COURT REPORTER

15

1           This is a discrete and separate situation, Judge
2   Glasser, that will cause Mr. Garafola to sit there for weeks,
3   months of securities money laundering transactions having
4   nothing, nothing to do with him and, most respectfully, and
5   I'm not one to point fingers and I'm not, the indictment does
6   describe, it does allege A, B and C and D are alleged
7   organized crime figures enlisted to protect and promote this
8   fraud.  Mr. Garafola is not named.  Mr. Corngold left out a
9   name.  He mentioned a bunch of names, you notice he did not
10  name Mr. Garafola as being someone allegedly brought in to the
11  enterprise for the muscle, no.  So, the indictment doesn't
12  even put him into this and I think that the prejudice is so
13  severe and so overwhelming in a case such as this that we meet
14  all the criteria for the Court to exercise its discretion and
15  sever Mr. Garafola.

16           MR. CORNGOLD:  Judge, I didn't talk about the Ray
17  aspect of the motions, I don't know if the Court wants me to
18  now or not.

19           THE COURT:  I'll hear Mr. Roth first.  I would note,
20  however, that in paragraph ten of the indictment which is
21  captioned The Enterprise Mr. Garafola is not mentioned as one
22  of the --

23           MR. CORNGOLD:  That's correct and Mr. Rosen is
24  correct that the government doesn't allege that Mr. Garafola
25  is one of the alleged organized crime people who are

HOLLY DRISCOLL, CSR        OFFICIAL COURT REPORTER

Case 13-2373, Document 67-3, 11/12/2013, 1090077, Page17 of 52   RJN 00 000117 102212

Case 1:04-cv-00013-ILG   Document 1-3   Filed 01/06/04   Page 17 of 30 PageID #: 67

JA 255

16

1  protecting the enterprise.  The indictment alleges essentially
2  that Mr. Garafola was acting on behalf of Mr. Polito, the
3  owner of U.S. Bridge of New York, one of the manipulated
4  stocks and that that's the role that he played.  So there's no
5  dispute that Mr. Garafola -- Mr. Garafola clearly is not
6  alleged to be a member of the RICO enterprise, he's not in the
7  substantive or the RICO conspiracy charge but the Court is
8  familiar with the numerous cases, some of which we cited, that
9  hold that you don't have to be a charged RICO defendant to be
10  properly joined or to be properly tried under Rule 14 and I
11  think that the Scarpa case is a good example of that.

12          MR. ROSEN:  Okay -- I don't want to say anymore.

13          THE COURT:  Before we leave this I was curious about
14  your footnote ten which refers to the Casamento case on page
15  36 of your memorandum.

16          MR. CORNGOLD:  Yes.

17          THE COURT:  Is there anything that has occurred since
18  you prepared this memorandum which would make that footnote of
19  more than passing relevance at this stage so far as the
20  severance motion is concerned?

21          MR. CORNGOLD:  I think I described another point in
22  the memorandum, the ongoing plea negotiations.  I can
23  represent to the Court that the government has -- three
24  defendants have pleaded guilty, one is scheduled to plead
25  guilty next week.  The government has agreements in principle

HOLLY DRISCOLL, CSR        OFFICIAL COURT REPORTER

17

1  with six other defendants and we're working out the details of

2  the plea agreement.  We anticipate though, of course,

3  defendants -- I mean the negotiations may not go exactly the

4  way that the government anticipates but it's my firm

5  anticipation that by the end of February there will be between

6  six and nine defendants who are left in the indictment and

7  because of that that obviously meets the Casamento numbers but

8  I can't say today that if we're ten or under.

9          THE COURT:  What effect would all that have upon an

10 informed determination of these motions to sever?

11          MR. CORNGOLD:  Well --

12          THE COURT:  The question, Mr. Corngold, is if these

13 prospective developments would have more than passing

14 relevance to this severance motion, then it might be prudent

15 for the Court to defer making a determination with respect to

16 those severance motions.

17          MR. CORNGOLD:  That's what I was going to propose,

18 Your Honor.  The Court has been very indulgent with all the

19 parties in this case.  What I believe is -- I will represent

20 that by the end of February, beginning of March the government

21 will have finished its plea negotiations and what I would

22 propose is a time in mid-March, early to mid-March by which

23 the Court could rule on the severance motions as a whole and

24 also set a trial date.  I would suggest though I do believe

25 that and we have to get to the Shvarts issue that may have

HOLLY DRISCOLL, CSR        OFFICIAL COURT REPORTER

18

1    something to do with the scheduling.

2          THE COURT:  Well, my concern is also I think it is

3    Section 3161, maybe subdivision (j), somewhere around that, it

4    is part of the Speedy Trial Act which I think imposes some

5    limitation upon the determination of motions and I think it

6    might be that withholding a determination until some time in

7    mid-March may collide with, I think it is (j).

8          MR. CORNGOLD:  Yes.

9          THE COURT:  The thought just occurs to me as I'm

10   discussing this with you, I may be wrong about the letter.

11         MR. CORNGOLD:  I believe, Your Honor, that the

12   provision provides 30 days after the motion is completely

13   briefed and argued though not -- it's really been a long time

14   since I've looked at it, but not as a requirement but as a

15   presumption.

16         THE COURT:  Okay.

17         MR. CORNGOLD:  And I think that given the reasons

18   that I've described it makes sense under the (h)(8) provision

19   for the Court to -- I'm bad with the letters.

20         THE COURT:  It is (h)(8)(A) I think but I'm just

21   raising that because I was curious about that footnote, it may

22   be that all of this would be academic, I may be able to decide

23   it without even considering Casamento.

24         Insofar as the severance motion -- the suppression

25   motion, it may be that I issued that order, Mr. Rosen, I

19

1  generally do as a matter of course with respect to suppression

2  motions but I will tell you now that I will deny it primarily

3  on the basis of United States versus Gilette and also because

4  I think the bases upon which you make that motion are so

5  purely speculative that I don't think a suppression hearing is

6  warranted.  I'll deny that motion.

7          MR. ROSEN:  Thank you.

8          THE COURT:  Mr. Ray, insofar as your severance motion

9  is concerned, that's been submitted, I'll deal with that.

10         MR. SMITH:  Your Honor, David Smith on behalf of

11 Rocco Basile.  Your Honor, given the posture that Mr. Basile

12 is in, as I explained to Your Honor before, I would ask that

13 we be excused.  These matters are no longer relevant to him

14 assuming he is pleading guilty on Wednesday.

15         THE COURT:  I think that's correct.

16         MR. CORNGOLD:  Yes, I agree.

17         THE COURT:  By all means.

18         Mr. Roth.

19         MR. ROTH:  Thank you.  Your Honor, in terms of the

20 severance motion, I adopt many of the arguments that Mr. Rosen

21 has made.  I think if there are two defendants in this case

22 that most warrant a severance, they are undoubtedly the two

23 defendants that are not charged in the RICO count.  There are

24 19 defendants here, 17 charged with RICO, the only two that

25 are not are Mr. Rosen's client and my client, Mr. Ray.  And I

HOLLY DRISCOLL, CSR       OFFICIAL COURT REPORTER

20

1  think Mr. Rosen is also correct that my client and Mr. Rosen's
2  client warrant a severance from one another because of the
3  unique circumstances that these defendants find themselves.

4      Your Honor, you can tell from my papers that my
5  client is uniquely situated here. He not only cooperated with
6  the FBI for a very extensive period of time on all sorts of
7  matters but also cooperated with the FBI in this particular
8  case against at least one defendant who will be sitting in the
9  courtroom with him, Mr. Garafola. As a matter of fact, at one
10 point and I think it was in 1996 the government engineered a
11 meeting between my client and Mr. Garafola that was at the
12 behest of the FBI, it was covered by the FBI, it wasn't
13 recorded apparently but that meeting exists.

14     Now, the only reason that my client cooperated at all
15 was because at some point in 1996 the FBI came to my client
16 and made certain allegations about threats that were being
17 made on his life, so at that point he was in a very, very
18 difficult position and more out of self-preservation than
19 anything else he decided to cooperate with the FBI and did so
20 including in this case.

21     And we've also interposed a public authority defense
22 here and I've served a notice on the government of that. Your
23 Honor, my concern with respect to Mr. Ray outside of the
24 obvious, his unique circumstances, is the fact that even if
25 all of the pleas that Mr. Corngold conjures here, even if they

HOLLY DRISCOLL, CSR        OFFICIAL COURT REPORTER

21

1   all occur, this is going to be a very, very lengthy trial,

2   literally months I would imagine because we're talking about

3   not only a RICO conspiracy and an enterprise but we're talking

4   about four or five or six different conspiracies, we're

5   talking about four different securities conspiracies, an

6   extortion conspiracy, a money laundering conspiracy and, quite

7   frankly, Mr. Ray in essence is involved in none of them.  I

8   know he's alleged to be part of the U.S. Bridge conspiracy but

9   the U.S. Bridge conspiracy at its core is a stock manipulation

10  scheme.  My client had nothing to do with stock manipulation,

11  he had nothing to do with U.S. Bridge.  He was sought out by

12  U.S. Bridge as an intermediary to go to a bonding company to

13  get a bond and the allegation is that he was given money and

14  that my client got money and in turn was supposed to bribe

15  somebody in the bonding company.  That is very, very

16  attenuated from that securities fraud scheme that he's charged

17  with.  Just like the extortion conspiracy that Mr. Garafola is

18  involved in, in my view, is very, very, very attenuated.

19          My concern is that we're going to be sitting here

20  and, by the way, about a month and a half ago I called

21  Mr. Corngold and asked him the same question that Your Honor

22  did, how many defendants do we have left in this thing, I'm

23  making a severance motion, how is this sorting out and he told

24  me, well, I think a month and a half ago, we've got three

25  pleas.  Well, a month and a half later we have three pleas.  I

HOLLY DRISCOLL, CSR        OFFICIAL COURT REPORTER

22

1   know he's very optimistic about all of this happening but
2   there's a good possibility I believe, he's been trying to get
3   these pleas for ten months, this has been going on since March
4   of the year 2000 and up to this point in ten months he's come
5   up with three pleas.  This may well be a case where we end up
6   with 14 or 15 defendants in this case and we might have a four
7   month trial and the evidence against Mr. Ray, if Your Honor
8   severed Mr. Ray, could be introduced in a three or four day
9   period.  He is involved in one transaction, a series of about
10  two, maybe three at the most meetings that all occurred in
11  1995.  There are a number of witnesses that the government
12  would put on, it could all be done in two or three, maybe four
13  or five days at the most.  I would like not to be in a
14  situation where we're sitting here month after month after
15  month where his name is not mentioned and that's going to
16  happen because he's not involved in any of these sophisticated
17  manipulation schemes, he's not involved in any money
18  laundering schemes, any offshore accounts or anything.  He's
19  involved in a very finite, very discrete transaction which
20  could be handled with a minimum number of witnesses and the
21  entire picture could be developed within a week.

22        So, for that reason, Your Honor, even if there are
23  pleas in the case, I believe he should be severed plus we have
24  the public authority defense which, quite frankly, involves my
25  client and no one else.  We're going to be off on a frolic of

HOLLY DRISCOLL, CSR        OFFICIAL COURT REPORTER

1   our own in this case, Your Honor, if Your Honor permits the
2   evidence which is going to require me to call a number of the
3   FBI agents as hostile witnesses who supervised my client and
4   who made certain promises and guarantees to him.  That's
5   something that has nothing to do with anybody else in this
6   courtroom.  And, by the way, Your Honor, in order for us to
7   develop his defense of public authority, we're going to have
8   to develop why he became an informant in the first place and
9   that, unfortunately, is going to reflect very negatively on
10  Mr. Rosen's client, I think it is unavoidable and I think
11  it's, you know, I'm not here preaching on Mr. Rosen's client's
12  behalf, Mr. Rosen can do that better than I, but it does
13  impact on his client in a very, very negative way and I don't
14  see how the two of them could possibly be tried together
15  provided Your Honor permits the public authority defense which
16  I think, quite frankly, Your Honor, is inevitable here.

17          MR. CORNGOLD:  See, I've had many conversations with
18  Mr. Roth about this public authority defense and I still have
19  to say, respectfully, that I just don't see, I don't see how
20  it can stand.  The conduct that Mr. Ray is alleged to have
21  engaged in in this indictment is in 1995.  At best what
22  Mr. Roth has is that some time after all that conduct was done
23  in 1996 Mr. Ray got hearsay information that there may be a
24  contract out about him by Mr. Garafola and as a result, he
25  decided to cooperate.  There's no -- I guess I just don't see

HOLLY DRISCOLL, CSR          OFFICIAL COURT REPORTER

24

1   how his decision to cooperate in '96 or his attempts to
2   cooperate or his alleged attempts to cooperate in 1996 can
3   somehow retroactively affect whether he did the conduct in '95
4   or not.  So, with all respect, as I said, the government will
5   move to preclude this public authority defense and I truly
6   don't see how it can possibly be relevant.

7            So, what the unique circumstances are here, even if
8   somehow Mr. -- this hearsay information that there's a threat
9   one year after the fact on Mr. Ray's life somehow came in, as
10  far as I can see, it would be admissible evidence against
11  both -- against Mr. Garafola, to go back to Mr. Garafola's
12  severance motion, if Mr. Garafola is making threats a year
13  later because of a deal gone bad because of relating to the
14  extortion, it is relevant evidence.  So, if it's admissible,
15  it is relevant both for the case against Mr. Garafola and the
16  case against Mr. Ray.  Zafiro makes clear that the idea of a
17  severance because evidence is going to be introduced is only
18  applicable if the evidence is going to be introduced against
19  one defendant that's inadmissible against another defendant.
20  Neither Mr. Garafola nor Mr. Ray have made any argument that
21  this evidence would be admissible for one case but not
22  admissible for the other case but, frankly, I don't see how
23  that evidence could ever come in to begin with.  So, I just
24  don't see how this after the fact cooperation is relevant to
25  the case.  I don't see how this threat evidence is relevant

HOLLY DRISCOLL, CSR        OFFICIAL COURT REPORTER

25

1    only for one defendant and not for another defendant.  If it
2    is somehow relevant or his attempts to cooperate, it is really
3    a garden variety situation which happens all the time where
4    defendants seek to cooperate after the fact, maybe make
5    proffer statements and then for whatever reason decide not to
6    cooperate and go to trial.  There's nothing unusual about that
7    here.

8            THE COURT:  Mr. Roth, if what I'm hearing from
9    Mr. Corngold is correct that the public authority basis or
10   defense basis is predicated upon conduct which comes after the
11   conduct which is alleged in this indictment, then how would
12   that be at all relevant if it were offered and if a motion in
13   limine were to be made, I'm not deciding it now, it hasn't
14   been made, but for purposes of your argument, what would the
15   relevance of that evidence be?

16           MR. ROTH:  Well, Judge, let me just add a few facts
17   which I think are relevant and which I alluded to in my papers
18   but I neglected to add orally.  My client did not start
19   cooperating until 1996.  After he did cooperate he was fully
20   debriefed about everything that happened in 1995 by the FBI on
21   numerous occasions.

22           THE COURT:  This was in 1996?

23           MR. ROTH:  In 1996.  He was told by the FBI that if
24   he continued to cooperate and his cooperation was extensive
25   after 1996 and did include matters within this indictment, he

26

1    was told that he would not only not be prosecuted, he wouldn't
2    have to testify.  That promise I would suggest by the FBI is
3    highly relevant on a public authority defense and he
4    cooperated with the express promise by the FBI that if he did
5    so and, in fact, was under the impression that he was risking
6    his life while he was doing it, he wouldn't be prosecuted on
7    this case.  The FBI and the United States Attorney's Office
8    then reneged on that promise and, therefore, he was indicted I
9    guess in 2000 and he finds himself here today.

10           His cooperation was very extensive in this case.
11   Mr. Corngold tries to create the impression that by the time
12   he cooperated this case was over.  That's not true.  He met
13   with Mr. Garafola in this case surveilled by the FBI in this
14   case.  He went to Russia on behalf of the FBI in this case to
15   bring Mr. Felix Sater, an unindicted co-conspirator and
16   cooperator with the government, an individual who is going to
17   testify, he went to Russia at the behest of the FBI to bring
18   him back to the United States.  Now, the FBI has conveniently
19   lost all records.  I've requested in discovery pursuant to
20   Rule 16 all records of his cooperation, 302s.  They don't have
21   anything but his cooperation did exist, we can prove it
22   independently and he was promised a walk on this case which he
23   did not get.

24           THE COURT:  Mr. Roth, I'm just thinking aloud, if
25   what you say is correct, is there some basis for a motion by

HOLLY DRISCOLL, CSR       OFFICIAL COURT REPORTER

27

1   you to dismiss the indictment against Mr. Ray by way of

2   enforcing a promise which you believe you can establish or by

3   way of enforcing a promise that he would not be called as a

4   witness?

5           MR. ROTH:  I mean I already know what the

6   government's answer is, Your Honor; their response is he

7   didn't tell them the truth, therefore, he violated the

8   agreement, therefore, he was prosecuted.

9           THE COURT:  Well, I don't know what the government's

10  answer is, all I know is what I'm hearing hear from you,

11  Mr. Roth, but I have a recollection going back nearly twenty

12  years, it was the first major criminal case that I had, it was

13  the Cunningham case, president of the union and two

14  co-defendants and as I recall it, there was a gentleman whose

15  name I can't remember who was promised by the government that

16  in the event he provided information, he would not be called

17  as a witness and then was subpoenaed and a motion was made to

18  quash the subpoena which was argued rather vigorously and I

19  granted that motion having found that there was such a promise

20  which causes me to think that if everything you say is true

21  and there was some agreement, maybe you have some remedy with

22  respect to that.

23          MR. ROTH:  Judge, I will concede --

24          THE COURT:  It might be worth testing.

25          MR. ROTH:  I will concede two things, Your Honor;

28

1   number one, that agreement was obviously not in writing or I'd

2   be in a position --

3            THE COURT:  It is not a statute of frauds problem.

4            MR. ROTH:  And number two, the United States

5   Attorney's Office clearly at the time it was made was not a

6   party to that promise.  So, I hear what Your Honor is saying

7   and perhaps I'll supplement my pretrial motions if Your Honor

8   would permit.

9            THE COURT:  What you're saying, Mr. Roth, reflects

10  rather seriously and badly upon a government agency, I mean I

11  hear this very frequently from defense counsel that the

12  government is acting in a rather unlawful, venal, dishonest

13  corrupt way, that argument is almost standard in many cases

14  which I hear by defense counsel and if there is some merit to

15  that, then perhaps the Court ought to be given an opportunity

16  to determine whether there is or isn't some merit to that.

17  But, in any event, if there's nothing else that you want to

18  add, I'll permit Mr. Corngold.

19           MR. CORNGOLD:  If I could just say three things about

20  what Mr. Roth said.  First, the converse of what the Court is

21  saying which I think is clear is that even if there is a

22  motion to be made to compel the enforcement of a contract or

23  having to do with the government's misbehavior here, that's

24  just not jury evidence, that's not a jury question, it is a

25  court question and it goes -- it doesn't go at all to the

HOLLY DRISCOLL, CSR        OFFICIAL COURT REPORTER

29

1  issue of guilt or innocence in this case.

2         THE COURT:  Well, it's not a question of guilt or

3  innocence, we're dealing with a severance motion.

4         MR. CORNGOLD:  That's correct though it is also tied

5  in to the discovery motion and it is relevant to the severance

6  motion because the premise of the motion or part of the

7  premise of the motion is there's going to be all of this ugly

8  evidence introduced that only relates to Mr. Ray that arguably

9  is damaging to Mr. Garafola and it's our position simply that

10  this evidence is just not admissible evidence in a trial,

11  either a joint trial or a severed trial.  I just want to say

12  two other things, I think we've said in the papers but just to

13  make it clear, it is simply not true that the government sent

14  Mr. Ray to Russia to bring Mr. Sater back and it is simply not

15  true that the government conveniently lost all the records.

16  The government has disclosed to Mr. Roth all the relevant 302s

17  that have to do with debriefings that occurred in this '96

18  period about these matters and it's just important I think for

19  the government to say that those two statements are just not

20  true.

21         THE COURT:  Okay.  Anything else?

22         MR. ROTH:  Thank you, Judge, no, nothing.

23         THE COURT:  That motion is submitted.  I think that's

24  the only motion you made.

25         MR. ROTH:  No, that's not true, Your Honor, I have a

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------x
LAWRENCE RAY,

                        Petitioner,

           -against-                              MEMORANDUM AND ORDER
                                                  04 CV 0013 (ILG)

UNITED STATES OF AMERICA,

                        Respondent.
------------------------------------------------x
GLASSER, United States District Judge:

       The petitioner seeks to vacate his conviction and sentence and proceeds pursuant

to 28 U.S.C. § 2255 in an attempt to obtain that relief which is bottomed upon his

assertion of ineffective assistance of counsel. The ineffectiveness claimed is the failure

of his attorney to move to dismiss the indictment on the ground that he was promised

immunity from prosecution by an FBI agent. He also challenges his sentence on an

unspecified legal ground, namely, that the imposition of home confinement interferes

with his ability to pursue business opportunities.

       Upon receipt of his petition, and in accordance with Sparman v. Edwards, 154

F.3d 51, 52 (2d Cir. 1998), I extended an invitation to Thomas G. Roth, Esq. "to be heard

and to present evidence, in the form of live testimony, affidavits or briefs." Mr. Roth

submitted an extensive affidavit with relevant attachments on the basis of which alone

this petition should be dismissed. See United States v. Chang, 250 F.3d 79 (2d Cir.

2001). This petition is meritless on other well settled grounds, a recognition of which

should have counseled against its filing. This is yet another of an endless stream of

petitions in which the defendant makes no pretense of innocence of the crime of which

he was convicted, but asserts some fanciful constitutional claim. See Friendly, Is

Innocence Irrelevant: Collateral Attack on Criminal Judgments, 38 U. Chi. L. Rev. 142(1970).

## Background

Ray was indicted together with 19 others in an indictment which charged two brokerage firms with the manipulation of the securities of U.S. Bridge of New York ("USBNY"), among others. He furthered the USBNY fraudulent scheme by agreeing to pay a $100,000 bribe to a bond brokerage firm executive to create the appearance that USBNY would be bonded and thus qualified to become the general contractor on large-scale construction projects. As a result, he was charged with conspiring to commit securities fraud and with committing securities fraud.

Until September 10, 2001, Ray was represented by Mr. Roth. At Ray's request, Mr. Roth was relieved as counsel by me after which, and until he pleaded guilty, Ray represented himself. I had urged Mr. Ray to obtain new counsel, notwithstanding his right to proceed *pro se*, which I advised against. He eventually did obtain new counsel to represent him at sentencing.

## Discussion

Strickland v. Washington, 466 U.S. 668, 694 (1984), instructs defendants similarly situated that they must show that: (1) counsel's performance was unreasonably deficient in the light of prevailing professional standards, and (2) there is a reasonable probability that the result of the proceeding would have been different but for counsel's deficiency.

To satisfy the first prong, the petitioner must show that the deficiency of counsel was so serious as to deprive him of the counsel guaranteed to him by the Sixth

RJN 00  000133  102212

JA 271

Amendment.

To satisfy the second prong, the petitioner must show that he was prejudiced by counsel's ineffectiveness but for which the outcome of his case would have been different.

Ray can establish neither prong and a hearing is not necessary to arrive at that conclusion. A § 2255 petitioner must do more than make bare and vague conclusory assertions which are the assertions Ray makes here. The FBI agent who allegedly promised that he would not be prosecuted if he cooperated is not identified. The time when, and the place where such a promise was made is not specified nor is there any indication whether the agent's promise was made orally or in writing. He simply declares that the facts as he states them "are true to the best of his knowledge and belief." That is hardly enough to warrant a hearing.

In his affidavit, Mr. Roth swears that he urged Mr. Ray to make the motion he now decries was not made, and appends to his affidavit as Exhibit A, an affidavit in support of Ray's motion to dismiss dated March, 2001, which Ray refused to sign. Mr. Roth provides his own affidavit immediately thereafter explaining the circumstances leading up to his preparation of that affidavit for Ray and Ray's refusal to sign.

As has been indicated, Mr. Roth did not represent Ray at the time of his plea. Ray insisted upon representing himself. His unconditional plea of guilty waived his claim that counsel who represented him prior thereto rendered ineffective assistance. United States v. Coffin, 76 F.3d 494 (2d Cir. 1996), *cert. denied* by Coffin v. United States, 517 U.S. 1147 (1996). There, the Court wrote at 76 F.3d 498:

3

> Although Coffin complains of ineffective assistance of
> counsel, his specific complaints are directed towards his
> original counsel . . . . His claims relate to the legal assistance
> provided by his initial counsel prior to the guilty plea . . . .
> Coffin's guilty plea effectively waived al ineffective assistance
> claims relating to events prior to the guilty plea.

<u>Coffin</u> is not distinguishable by the fact that Ray was representing himself when

pleading guilty. He makes no claim that his plea was either involuntary or unknowing.

The principle which would declare the FBI agent's promise unenforceable even if

one were made, would preclude any possibility that a motion to dismiss the indictment

would have been granted, and thus precluded any possibility that the second prong of

<u>Strickland</u> could be satisfied   namely, the outcome of the proceeding would not have

been different. The principle to which reference was made was succinctly stated by

Judge Selya in <u>United States v. Flemmi</u>, 225 F.3d 78 (1st Cir. 2000), as follows:

> Virtually by definition, a government agent possesses express
> authority to bind the government if - and only if - the
> Constitution, a federal statute, or a duly promulgated
> regulation grants such authority in clear and unequivocal
> terms.

Finally, his objection to the restrictions upon travel imposed incident to his

sentence of home confinement is meritless.

For all the foregoing reasons, his petition is dismissed.

SO ORDERED.

Dated:        Brooklyn, New York
              February 18  2004

                                          _____
                                          I. Leo Glasser

4

Copies of the foregoing memorandum and order were sent to:

Eric Corngold, Esq.
Assistant U.S. Attorney

Michael V. Gilberti, Esq.
Bonney Epstein & Gilberti, LLC
321 Broad Street
Red Bank, NJ 07701

Thomas G. Roth, Esq.
395 Pleasant Valley Way
West Orange, NJ 07052

JA 274

EOC:DV
F.#13398:01396
WITNESS-LIST.wpd

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA                    09 Cr 196 (ILG)

         - against -

DANIEL PERSICO,

              Defendants.

- - - - - - - - - - - - - - - - X


                 THE GOVERNMENT'S WITNESS LIST


         1.    Traci Manuel

         2.    Joseph Polito

         3.    Felix Sater

         4.    Special Agent Leo Taddeo

         5.    Professor Steven Thel




                              Respectfully submitted,

                              ALAN S. VINEGRAD
                              United States Attorney
                              Eastern District of New York


Eric O. Corngold
David B. Pitofsky
Assistant U.S. Attorneys
  (Of counsel)

**FILED** JA 275
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y
★  SEP 1 0 2012  ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------x
UNITED STATES OF AMERICA,

          Plaintiff,

    -against-

ALFRED PALAGONIA,

          Defendant.
-------------------------------------------x

ORDER
00 CR 196 (ILG)

GLASSER, United States District Judge:

At the conclusion of a proceeding held on March 25, 2011, the defendant asked whether the Court "would . . . consider sealing [it] after it is completed." The government did not join in that request. I indicated at the time that I would consider it. Tr. 13.

My attention has just been called to the fact that that brief colloquy has eluded me and addressing it now, I must deny it. An extensive discussion of the authorities that compels me to that conclusion would be superfluous. The citation to a modest few should suffice. Hartford Courant Co., v. Pellegrino, 380 F.3d 83 (2d Cir. 2004); United States v. Doe, 63 F.3d 121 (2d Cir. 1995); United States v. Zazi, 2010 WL 10605 (E.D.N.Y. 2010).

    SO ORDERED.

Dated:    Brooklyn, New York
        September 10, 2012

                         s/ILG

                    I. Leo Glasser

Filed via ECF and faxed to:
    Joseph DiBlasi, Esq.
    Alison Cooley, AUSA

**JA 276**

| 10/17/2012 | 71 | ORDER, re Request for Immediate Clarification ( 64 in 1:12-mc-00150-ILG), ( 54 in 1:12-mc-00557-BMC). Docket #12-MC-557 is the properly designated docket in which all matters pertaining to the issued dedicated to it are properly filed and need not be transferred to another docket. His (Oberlander's) assertion that they must be, is denied. Ordered by Judge I. Leo Glasser on 10/15/2012. (Layne, Monique) (Entered: 10/17/2012) |

From 12-MC-00150 (EDNY) (Glasser, J.)

RJN 00 000448 102212

JA2277

# ORGANIZED CRIME ON WALL STREET

# HEARING

BEFORE THE

## SUBCOMMITTEE ON
## FINANCE AND HAZARDOUS MATERIALS

OF THE

## COMMITTEE ON COMMERCE
## HOUSE OF REPRESENTATIVES

ONE HUNDRED SIXTH CONGRESS

SECOND SESSION

————

SEPTEMBER 13, 2000

————

## Serial No. 106–156

————

Printed for the use of the Committee on Commerce

U.S. GOVERNMENT PRINTING OFFICE

67–115CC                    WASHINGTON : 2000

RJN 00  000449  102212

JA 278

## COMMITTEE ON COMMERCE

### TOM BLILEY, Virginia, *Chairman*

| | |
|---|---|
| W.J. "BILLY" TAUZIN, Louisiana | JOHN D. DINGELL, Michigan |
| MICHAEL G. OXLEY, Ohio | HENRY A. WAXMAN, California |
| MICHAEL BILIRAKIS, Florida | EDWARD J. MARKEY, Massachusetts |
| JOE BARTON, Texas | RALPH M. HALL, Texas |
| FRED UPTON, Michigan | RICK BOUCHER, Virginia |
| CLIFF STEARNS, Florida | EDOLPHUS TOWNS, New York |
| PAUL E. GILLMOR, Ohio | FRANK PALLONE, Jr., New Jersey |
| *Vice Chairman* | SHERROD BROWN, Ohio |
| JAMES C. GREENWOOD, Pennsylvania | BART GORDON, Tennessee |
| CHRISTOPHER COX, California | PETER DEUTSCH, Florida |
| NATHAN DEAL, Georgia | BOBBY L. RUSH, Illinois |
| STEVE LARGENT, Oklahoma | ANNA G. ESHOO, California |
| RICHARD BURR, North Carolina | RON KLINK, Pennsylvania |
| BRIAN P. BILBRAY, California | BART STUPAK, Michigan |
| ED WHITFIELD, Kentucky | ELIOT L. ENGEL, New York |
| GREG GANSKE, Iowa | TOM SAWYER, Ohio |
| CHARLIE NORWOOD, Georgia | ALBERT R. WYNN, Maryland |
| TOM A. COBURN, Oklahoma | GENE GREEN, Texas |
| RICK LAZIO, New York | KAREN McCARTHY, Missouri |
| BARBARA CUBIN, Wyoming | TED STRICKLAND, Ohio |
| JAMES E. ROGAN, California | DIANA DeGETTE, Colorado |
| JOHN SHIMKUS, Illinois | THOMAS M. BARRETT, Wisconsin |
| HEATHER WILSON, New Mexico | BILL LUTHER, Minnesota |
| JOHN B. SHADEGG, Arizona | LOIS CAPPS, California |
| CHARLES W. "CHIP" PICKERING, | |
| Mississippi | |
| VITO FOSSELLA, New York | |
| ROY BLUNT, Missouri | |
| ED BRYANT, Tennessee | |
| ROBERT L. EHRLICH, Jr., Maryland | |

JAMES E. DERDERIAN, *Chief of Staff*

JAMES D. BARNETTE, *General Counsel*

REID P.F. STUNTZ, *Minority Staff Director and Chief Counsel*

———————

## SUBCOMMITTEE ON FINANCE AND HAZARDOUS MATERIALS

### MICHAEL G. OXLEY, Ohio, *Chairman*

| | |
|---|---|
| W.J. "BILLY" TAUZIN, Louisiana | EDOLPHUS TOWNS, New York |
| *Vice Chairman* | PETER DEUTSCH, Florida |
| PAUL E. GILLMOR, Ohio | BART STUPAK, Michigan |
| JAMES C. GREENWOOD, Pennsylvania | ELIOT L. ENGEL, New York |
| CHRISTOPHER COX, California | DIANA DeGETTE, Colorado |
| STEVE LARGENT, Oklahoma | THOMAS M. BARRETT, Wisconsin |
| BRIAN P. BILBRAY, California | BILL LUTHER, Minnesota |
| GREG GANSKE, Iowa | LOIS CAPPS, California |
| RICK LAZIO, New York | EDWARD J. MARKEY, Massachusetts |
| JOHN SHIMKUS, Illinois | RALPH M. HALL, Texas |
| HEATHER WILSON, New Mexico | FRANK PALLONE, Jr., New Jersey |
| JOHN B. SHADEGG, Arizona | BOBBY L. RUSH, Illinois |
| VITO FOSSELLA, New York | JOHN D. DINGELL, Michigan, |
| ROY BLUNT, Missouri | (Ex Officio) |
| ROBERT L. EHRLICH, Jr., Maryland | |
| TOM BLILEY, Virginia, | |
| (Ex Officio) | |

(II)

JA 279

# CONTENTS

Page

Testimony of:

Fuentes, Thomas V., Chief, Organized Crime Section, Criminal Investigation Division, Federal Bureau of Investigation ........................................... 114

Goldsmith, Barry R., Executive Vice President, NASD Regulation, Inc., Office of Enforcement ................................................................................. 137

Skolnik, Bradley W., Securities Commissioner, State of Indiana, President, North American Securities Administrators Association, Inc ........... 131

Walker, Richard H., Director, Division of Enforcement, Securities and Exchange Commission ............................................................................... 119

Additional material submitted for the record:

Skolnik, Bradley W., Securities Commissioner, State of Indiana, President, North American Securities Administrators Association, Inc., letter dated October 20, 2000, enclosing response for the record ....................... 280

(III)

3

JA 280

# ORGANIZED CRIME ON WALL STREET

––––––––––

### WEDNESDAY, SEPTEMBER 13, 2000

House of Representatives,
Committee on Commerce,
Subcommittee on Finance and Hazardous Materials,
*Washington, DC.*

The subcommittee met, pursuant to notice, at 10:05 a.m., in room 2322, Rayburn House Office Building, Hon. Michael G. Oxley (chairman) presiding.

Members present: Representatives Oxley, Largent, Shimkus, Fossella, Ehrlich, Bliley (ex officio), Barrett, Luther, and Markey.

Staff present: Brian McCullough, majority professional staff; Robert Simison, legislative clerk; and Consuela Washington, minority counsel.

Mr. OXLEY. The subcommittee will come to order.

Good morning. Today's hearing might sound like an episode of The Sopranos, but it is not HBO. It is real. We are going to hear the true stories about people getting bilked out of their hard-earned money by the Mob. I know from my own experience as a special agent in the FBI that the Mob will go wherever a dollar is being made. Today that is Wall Street. So it is really not surprising that organized crime is trying to suck some of the life out of the blossoming securities markets. The M-O-B has gone back to school and gotten an MBA. The wiseguys are getting smart. They used to play ponies. Now they are playing the markets and investors for everything they are worth.

When I was in the FBI investigating the organized crime in Boston, the Mob was in shipping, racketeering, garbage, loan sharking and good old-fashioned shakedowns. Now they are moving from the old economy to the new, but using the same old tactics of intimidation, extortion and manipulation.

As reported by Greg B. Smith of the New York Daily News, one anonymous regulator discussed what he called the maggot run, meaning the Mob-connected brokers moving from one firm to another, attempting to stay just ahead of the law. By the way, I would recommend Mr. Smith's article of this past Sunday to anyone interested in reading more about the topic. This happens to be the front page of the article "The Mob on Wall Street: Inside the Mafia Stock Fraud Scams." And I think it says a lot about what we are going to be discussing today; the lure of quick profits in the securities markets that has turned businessmen into criminals and criminals into businessmen.

It is our job to work with the organizations testifying before us today to ensure that the U.S. capital markets are clean and fair

(1)

RJN 00 000645 102212

JA 282

194



U.S. Department of Justice 

*United States Attorney*
*Eastern District of New York*

One Pierrepont Plaza
Brooklyn, New York 11201

*Mailing Address:* 147 Pierrepont Street
Brooklyn, New York 11201

Contact: **Peggy Long**                                    March 2, 2000
        **United States Attorney's Office**
        **(718) 254-6267**

        **Joseph Valiquette**
        **Federal Bureau of Investigation**
        **(212) 384-2715**

        **Marilyn Mode**
        **New York City Police Department**
        **(212) 374-6700**


## PRESS RELEASE

### 19 DEFENDANTS INDICTED IN
### STOCK FRAUD SCHEME THAT WAS PROTECTED
### AND PROMOTED BY ORGANIZED CRIME

**LORETTA E. LYNCH**, United States Attorney for the Eastern District of New

York, **LEWIS D. SCHILIRO**, Assistant Director-in-Charge of the Federal Bureau of Investigation

in New York, and **HOWARD SAFIR**, Commissioner, New York City Police Department, today

announced the indictment of nineteen defendants, including six members and associates of various

Organized Crime Families of La Cosa Nostra, who are charged with participating in a large-scale

stock fraud and money laundering scheme between 1993 and 1996  Seventeen of the nineteen

195

2

defendants are charged with racketeering

The charges in the indictment center on the activities of two brokerage firms with offices in downtown Manhattan  White Rock Partners & Co ("White Rock") and State Street Capital Markets Corporation ("State Street").[1]  The indictment alleges that the principals of White Rock and State Street, together with other brokers and brokerage firms, planned and carried out a series of fraudulent securities schemes and then laundered tens of millions of dollars of illicit profits

As alleged in the indictment, the schemes were led by the defendants JOHN DOUKAS and WALTER DURCHALTER, together with Gennady Klotsman, Salvatore Lauria and Felix Sater, who collectively controlled White Rock and State Street ("the White Rock and State Street Partners").[2]  The White Rock and State Street Partners secretly acquired large blocks of stock and warrants in the following four companies:  Country World Casinos, Inc. ("Country World"), which was based in Colorado and was purportedly attempting to develop a casino in Black Hawk, Colorado. Holly Products, Inc. ("Holly"), which was based in Moorestown, New Jersey and was in the business of manufacturing tables and cabinets for the gaming industry and custom-built equipment for hospitals; U.S. Bridge of New York, Inc. ("USBNY"), which was based in Queens, New York and was a subcontractor on public infrastructure projects in the greater New York area; and Cable & Co Worldwide, Inc. ("Cable"), which had offices in New York and New Jersey and designed and imported men's footwear which was sold to department and specialty stores in the United States

The indictment alleges that the White Rock and State Street Partners were able to

_____

[1] White Rock and State Street ceased operations in late 1996.

[2] Klotsman, Lauria and Sater have previously pleaded guilty to RICO charges in connection with their activities at White Rock and State Street.

JA 284

196

3

acquire secret control of these securities through undisclosed financial arrangements with the following defendants ABRAHAM SALAMAN, a stock promoter who provided the Country World stock; LARRY BERMAN, Holly's chairman and chief executive officer; and JOSEPH POLITO, SR., an associate of the Gambino Organized Crime Family who was the president and principal shareholder of USBNY.

As alleged in the indictment, the White Rock and State Street Partners secretly acquired control of the securities in the name of various nominees including the defendant DANIEL LEV. Most often, the nominees were off-shore companies controlled by the White Rock and State Street Partners. The price of the securities was then artificially inflated through the activities of brokers who fraudulently sold the stock to investors in return for received undisclosed cash payments from the White Rock partners. These brokers included the defendants JACK BASILE, ROCCO BASILE and JOSEPH TEMERINO at White Rock, and ALFRED PALAGONIA and JOHN CIOFFOLETTI, who were brokers at J.W. Barclay & Co., Inc., and D.H. Blair & Co., Inc., respectively.[3] Among the techniques used to artificially inflate and maintain the price of the manipulated securities, the indictment alleges that the defendants: (a) made false and misleading statements to persuade investors to buy and then not to sell the securities; (b) purposely failed to take and execute customer orders to sell the securities; and (c) only executed a sale of a security if the sale could be matched or "crossed" with a corresponding purchase of the same security by another investor.

---

[3] JACK BASILE also has securities fraud and money laundering charges pending against him in United States v. Dionisio, et al., 99 CR 589 (EDNY). ROCCO BASILE has securities fraud and money laundering charges pending against him in United States v. Catoggio, 98 CR 1129(S) (SDNY).

197

4

The indictment alleges that after the price of the stock was artificially inflated, the defendants sold their secretly held stock for a substantial profit. The proceeds from these illicit sales were then laundered through multiple transfers of funds to off-shore bank accounts by the defendant ALEKS PAUL, who then provided a corresponding amount of cash, less a money laundering fee, to the White Rock and State Street Partners.[4] Profits for other defendants were laundered through different schemes. For example, the indictment alleges that defendants JOSEPH POLITO, SR. and EDMOND NAGEL[5] secretly divided proceeds of approximately $380,000 derived from the sale of USBNY warrants that were deposited in an off-shore nominee's brokerage account controlled by NAGEL.

The indictment further alleges that the White Rock and State Street Partners enlisted the help of individuals affiliated with Organized Crime Families of La Cosa Nostra to protect and promote their criminal activities by resolving disputes and performing other services. Defendant FRANK COPPA, SR. was a captain in the Bonanno Organized Crime Family. Defendant ERNEST MONTEVECCHI was a soldier in the Genovese Organized Crime Family.[6] Defendant DANIEL PERSICO was an associate of the Colombo Organized Crime family. Defendant EUGENE

---

[4] PAUL also has securities fraud and money laundering charges pending against him in United States v. Schwartz, et al., 99 CR 372 (EDNY), and United States v. Paul, et al., 99 CR 261 (SDNY).

[5] NAGEL also has bank fraud charges pending against him in United States v. Gangi, et al., 97 CR 1215 (SDNY).

[6] MONTEVECCHI is in custody based on his 1999 conviction in United States v. Gangi, et al., 97 CR 1215 (SDNY).

RJN 00 000649  102212

JA 286

198

5

LOMBARDO was an associate of the Bonanno Organized Crime Family.⁷ COPPA, MONTEVECCHI, PERSICO and LOMBARDO resolved and attempted to resolve disputes relating to the hiring and retention of brokers, the extortion and attempted extortion of participants in the scheme, and concerted efforts to reduce the price of securities underwritten by White Rock and State Street through short selling. In return for this assistance, COPPA, MONTEVECCHI, PERSICO and LOMBARDO received compensation in the form of securities and cash proceeds from the sale of securities.

The indictment also alleges that, in connection with the USBNY fraud scheme, the defendant LARRY RAY agreed to pay $100,000 to an executive of a bond brokerage firm to insure that USBNY would be granted bonding that would enable it to act as a general contractor on large-scale construction projects. Finally, the indictment alleges that defendants JOSEPH POLITO, SR., USBNY's president and an associate in the Gambino Crime Family, and EDWARD GARAFOLA, a soldier in the Gambino Crime Family, attempted to extort money from Felix Sater and others to recoup this $100,000 cash payment, but that defendant ERNEST MONTEVECCHI intervened on Sater's behalf, causing the extortionate demands to cease.

The charges in the current indictment carry the following maximum sentences: as to each RICO count, 20 years imprisonment, 3 years supervised release, a $250,000 fine (or twice the gross gain or loss) and an order of restitution; as to each money laundering count, 20 years imprisonment, 3 years supervised release, a $250,000 fine (or twice the gross gain or loss) and an order of restitution; as to each substantive securities fraud count, 10 years imprisonment, 3 years

---

⁷LOMBARDO is in custody based on his 1999 conviction in United States v. "Gangi, et al., 97 CR 1215 (SDNY).

199

7

seized it   A recurrent theme in our investigations has been that organized crime goes where the

money is  We intend to be there when they get there "

       Commissioner **SAFIR** stated  "I am pleased to join with United States Attorney

Loretta Lynch, and Assistant Director- in-Charge of the Federal Bureau of Investigation in New York

Lewis Schiliro, in announcing the indictment of 19 individuals responsible for a $40 million dollar

stock fraud ring  We called this 'Operation Street Cleaner,' because it was designed to fight fraud

on Wall Street, but it could just as well been titled 'Goodfellas Meet the Boiler Room '  For those

that seek to use these 'pump and dump' schemes to prey on unsuspecting investors, today's

indictment should serve as a stark reminder that stock fraud is a serious crime and the law

enforcement community is firmly committed to shutting down these and other illicit operations used

to support organized crime."

       Those defendants arrested in New York will be arraigned today by Magistrate Judge

Joan M. Azrack at the United States Courthouse in Brooklyn.

       The case is being prosecuted by Assistant U.S. Attorneys Jonathan S Sack, Eric

Corngold and Richard Molot.

RJN 00 000651 102212

JA 288

200

8

The Defendants

FRANK COPPA, SR.
8 Brittany Ct.
Manalapan, NJ
DOB: 9/11/41
Counts: 1, 2, 3, 4, 13, 14, 15, 16


ERNEST MONTEVECCHI,
a/k/a "Butch"
Incarcerated
DOB: 6/18/45
Counts: 2, 13, 14


DANIEL PERSICO
6615 Wallaston, Ct.
Brooklyn, NY
DOB: 4/9/62
Counts: 2, 13, 14

JACK BASILE
1444 73d Street
Brooklyn, NY
DOB: 2/7/73
Counts: 2, 5, 6, 7, 8

ROCCO BASILE
150 Bay 8th Street
Brooklyn, NY
DOB: 2/21/68
Counts: 2, 5, 6, 7, 8

LARRY BERMAN
450 Merion Rd.
Merion Station, PA
DOB: 11/30/34
Counts: 1, 2, 3, 4, 5, 6, 7, 8

201

9

**JOHN CIOFFOLETTI**
27 Seagull Lane
Lincroft, NJ
DOB: 11/20/69
Counts: 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 15, 16, 17, 18

**JOHN DOUKAS**
35 Briar Ct.
Cross River, NY
DOB: 2/19/48
Counts: 1, 2, 5, 6, 7, 8, 9, 10, 11, 12, 15, 16, 17, 18

**WALTER DURCHALTER,**
a/k/a "Dutch"
63-57 84th Street
Middle Village, NY
DOB: 9/30/65
Counts: 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12

**EDWARD GARAFOLA**
143 Lander Ave.
Staten Island, NY
DOB: 3/25/38
Counts: 19, 20

**DANIEL LEV**
149-05 Rockaway Beach Blvd.
Neponsit, NY
DOB: 7/12/66
Counts: 1, 2, 9, 10, 11, 12

**EUGENE LOMBARDO**
Incarcerated
DOB: 4/20/52
Counts: 1, 2, 3, 4, 9, 10, 11, 12

**EDMOND NAGEL**
New York, NY
DOB: 11/1/40
Counts: 1, 2, 9, 10, 11, 12

RJN 00 000653 102212

JA 290

202

10

**ALFRED PALAGONIA**
18 Eastgate Rd.
Port Washington, NY
DOB: 12/31/66
Counts: 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 15, 16, 17, 18

**ALEKS PAUL**
4 Ridgeway Drive
Kings Point, NY
DOB: 11/7/57
Counts: 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12

**JOSEPH POLITO, SR.**
Boca Raton, Florida
DOB: 5/15/34
Counts: 1, 2, 9, 10, 11, 12, 19, 20

**LAWRENCE RAY**
2 Cedar Ridge Lane
Warren, NJ
DOB: 11/16/59
Counts: 9, 10

**ABRAHAM SALAMAN**
9728 Wynmill Rd.
Philadelphia, Pa.
DOB: 10/29/35
Counts: 2, 3, 4

**GIUSEPPE TEMPERINO,**
a/k/a "Joseph Temperino"
263 Avenue S
Brooklyn, NY
DOB: 8/27/74
Counts: 2, 5, 6, 7, 8