No. 13-2373

**IN THE**

# United States Court of Appeals

**FOR THE SECOND CIRCUIT**

_____

IN RE APPLICATIONS TO UNSEAL 98 CR 1101 (ILG),
USA V. JOHN DOE 98-CR-01101

LORIENTON N.A. PALMER AND
FREDERICK M. OBERLANDER,

*Movants-Appellants*,

v.

UNITED STATES OF AMERICA AND
FELIX SATER,

*Respondents-Appellees.*

_____

**APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

_____

**FRAP 35 PETITION FOR *EN BANC* REHEARING ONLY**

_____

RICHARD E. LERNER, ESQ.
501 Fifth Avenue, Suite 300
New York, NY 10017
(917) 584-4864  Tel.
(347) 824-2006  Fax
richardlerner@msn.com
*Counsel for Movant-Appellants*

July 21, 2014
July 28, 2014 (modified)

# FRAP 35 STATEMENT

Appellants seek *en banc* rehearing of the panel decision of June 5, 2014 issued by Judges Cabranes, Pooler, and Chin, for these reasons, as set forth more fully below:

*Uniformity:* The decision conflicts with decisions of the Supreme Court and this court[1], so consideration by the full court is necessary to secure and maintain uniformity.

*Importance:* The actions of the district court raise questions of first impression of exceptional importance, violate authoritative decisions of other federal appellate courts, and if not disapproved by the entire court threaten to undermine the integrity of the U.S. judicial system and the public's confidence in, and access to, its courts so it may police them against this threat. The panel's disposition by summary order, validating those actions without explanation, is antithetical to the *raison d'être* of summary orders.

A full list these questions begins on page 5. But at its core, this appeal presents two straightforward questions of first impression in the Circuit – and in the nation:

> 1. May a district court conceal a criminal case despite knowing the defendant's conviction and cooperation were already disclosed publicly and the government has conceded there has never been evidence of any risk, *a fortiori* defying circuit and Supreme Court sealing and access precedents, violating substantive and procedural First Amendment and common law rights (failing to hold hearings, make findings, or issue orders to justify it), *a fortissimo* with the result of concealing the defendant's illegal sentencing not only from the public but also from his federally protected crime victims, defying Congress' mandate by depriving them, by such concealment, of $200,000,000 of mandatory restitution and their rights to sue for it?
>
> 2. May a district court holding an unsealing hearing refuse to admit evidence proffered by proponents of unsealing, even where it would establish that the opponents have colluded, and are colluding, in fraud on the court?

---

[1] *Richmond Newspapers v. Virginia*, 448 U. S. 555 (1980); *Press-Enterprise v. Superior Court,* 478 U.S. 1 (1986); *Caroll vs. Princess Anne*, 393 U.S. 175 (1968); *Near v. Minnesota*, 283 U.S. 697 (1931); *U.S. v. Alcantara*, 396 F.3d 189 (CA2 2005); *Hartford Courant v. Pellegrino*, 380 F.3d 83 (CA2 2004); *In re Application of the Herald Co.,* 734 F.2d 93, 100 (CA2 1984).

In years of precedent-defying if not law-defying actions which, when revealed, caught the protracted interest of national authorities and legal and lay media, the district court (Glasser, J.) answered these questions affirmatively, hiding Sater's criminal case for fifteen years though his conviction and cooperation were matters of public record and Probation, the government, and defense counsel knew he was using the secrecy to evade restitution by hiding millions of dollars from his old victims and to defraud new victims of $1,000,000,000 by concealing his conviction from his investors and partners.

For three of those years, backed by previous summary orders of the same panel, the court maintained the secrecy, letting his concealment frauds continue, by threatening appellants and counsels with criminal contempt if they even used *public* information to reveal it, indeed issuing the first *hyper-injunction* in US history, purporting to forbid us not only from telling Congress what we knew of the judicial and government corruption at the core but even forbidding us from telling Congress of the very injunction itself.

Then, when this finally *was* revealed and appellants moved to "unseal" what was hidden, the court, now forced to hold hearings on what to "unseal," again chose secrecy, closing them to appellants and the press and refusing to let appellants introduce evidence that (1) Sater's conviction and cooperation had been public for a decade and the court, the government, and Sater *knew* it; and (2) the government and Sater's evidence of a new threat of harm to him was *fabricated*, a continuation of years of collusive fraud.

Appellants sought relief here, arguing (1) as to the "sealing," the court's refusal to hold hearings, make findings, or issue a sealing order made all the years of concealments unlawful; and (2) as to the "unsealing," its failure to let them admit evidence was structural error that led to a false and fraudulent court order issued in secret and filed

3

in secret with the Supreme Court so it would deny appellants' petition for *certiorari*[2,3].

The panel affirmed in a summary order that failed to acknowledge, let alone address, most of appellants' claims of error, including their argument that the concealment had been illegal *ab initio*, dismissing them as without merit. Yet use of summary order to validate a court without elaboration is reserved for issues that don't require explanation or conflict with precedent, "when a decision in a case is unanimous and each panel judge believes that no jurisprudential purpose is served by an opinion." L.R. 32.1.1(a).

That's not so here. The district court's actions *repudiate* precedent and raise issues the *NY Law Journal* thought worth front page coverage. That no jurisprudential purpose would be served by an opinion analyzing, if not disapproving, a court that (1) hid a case without hearing, finding, or order, *knowing* the conviction and cooperation were public and the secrecy used to defraud even victims the court was mandated to protect; and (2) evidently conspired to ignore appellant's filings; abuse contempt power, fabricate a record, and perpetrate fraud on the Supreme Court to cover it up; is inconceivable.

Consider that last paragraph. Facts supplying more than probable cause for these statements were detailed, Br. and Rep. Br. *passim*, and are summarized below. How did an appeal whose briefs allege acts of fraud on the Supreme Court and this court generate a summary order? Where's the referral to Public Integrity to investigate the charges, or

---

[2] Oberlander had appealed to the Supreme Court from the panel's affirmance of an injunction preventing him from revealing the contents of the PSR, his petition detailing the secret criminal courts of this circuit and asking the high court to ban them. Though the Court denied cert, it gave him effectively complete victory when it first granted his motion to be allowed to disclose significant portions of the documents and proceedings hidden by the district court and by the panel which revealed the fraud and corruption.

[3] Though by then much was unsealed, argument that the concealment was unlawful *ab initio* was a proper issue for appeal as a matter "capable of repetition yet evading review."

Order to Show Cause for counsel to prove their merit? Tellingly, nowhere. To read the summary order is to think nothing like that happened. As to that, with respect, we cannot write in denial of reality that courts use summary orders to hide inconvenient truth:

> The nonpublication of opinions that reveal problems transcending mere mistake is even more objectionable. Such cases give rise to a strong suspicion that the court does not care to wash its dirty linen in public. A prime example is *U.S. v. Ritter*, where the full Tenth Circuit vacated an order issued by Chief Judge Willis Ritter of the District of Utah. The…prohibited the judge's "court reporter from carrying out the duties imposed upon him by law." The decision came at a time when Congress was considering…a procedure, short of impeachment, to hold federal judges accountable; the problems of Chief Judge Ritter figured in the debate. The scope of the problems he had created clearly should have been revealed to a directly interested Congress and legal community[4].

Given the proof of misconduct, that the panel shoved this under a rug is manifest by its issuance of mandate forthwith to bar *en banc* review, used in meritless cases to signal no import to the full court or Supreme Court, and by its omission from the order that the Reporters Committee for Freedom of the Press had joined as amicus to address some of the First Amendment issues raised (only one, 7, even mentioned in the order)[5]:

> 1.  May a document or docket be deemed lawfully sealed where the record establishes that no pre-closure hearing was ever announced or held, no sealing order was ever issued, no transcript reflects that a sealing order was ever announced, and no findings exist capable of appellate review?
>
> 2.  May a blanket sealing order, *a fortiori* where there is, *supra*, no evidence of its issue, content, or justification, exist constitutionally, at least for any appreciable time, without periodic review of its continuing validity?

---

[4] Reynolds & Richman, *An Evaluation of Limited Publication in the United States courts of Appeals: The Price of Reform.* 48 U.Chi.L.Rev. 573 (1981). Posner, *The Federal Courts: Crisis and Reform,* (1985) ("unpublished opinion provides a temptation for judges to shove difficult issues under the rug"); Adams, *Increased Use of Unpublished Opinions Faulted,* N.Y.L.J., 8/2/94 (quoting Feinberg, J., that they can be used to sweep decisions under the rug).

[5] It can't be good faith to say the Supreme Court would have no interest as in our last petition, supported by amici, it overrode the panel's injunctions, allowed us to disclose contents of the PSR, called for the response of the Solicitor General, and denied cert only after the government submitted a fraudulent filing secretly from us. See *infra*.

3. May a criminal case be sealed, in whole or in part, based only on factors such as a defendant's professed, subjective fear of harm, or does such closure require objective evidence of a near-certain imminent, grave harm?

4. May a criminal case be closed to the public for sentencing, *a fortiori* where there is no particularized, or any, process justifying it, *a fortissimo* where there are victims statutorily entitled to notice of and to be heard at the proceeding and closure will deprive them of Congressionally provided property rights, *e.g.* mandatory restitution and the standing to sue to get it?

5. After a sentencing *has* been held in open court, may that sentencing, and for that matter all proceedings *ab initio* leading up to it, remain sealed?

6. May sealing orders prevent parties from reporting official misconduct: may a court, by mere sealing orders, threaten contempt to debar parties from revealing its own, government, and related private corruption?

7. Notwithstanding that the proponent of maintaining a seal may in certain cases present supporting argument and evidence *in camera* and *ex parte*, nevertheless is it structural error, or at least trial error, to refuse to allow the *opponent* (appellants) to introduce evidence they reasonably believe will contradict or impeach the proponent's proffers, especially where, as here, the opponent (appellants) not only knows much of their evidence but also knows that much of it is the fabricated product of rank criminal fraud.

This isn't the first time the panel may be said to be hiding things. In its summary order of June 29, 2011 in No. 10-2905, the panel said the district court had based a permanent injunction on dissemination of the PSR (an injunction the Supreme Court mooted in 2012 when it granted appellant's motion to be allowed to reveal key parts of it) on a finding that appellant had "flouted" an implied order. Yet the record, shows the district court issued the injunction on June 21, 2010, saying it did so based solely on the fact it was a PSR, yet not for eight months, until March 23, 2011, did it issue a scheduling order purporting to find appellant "flouted" an "implied" order. And, the panel said it had reviewed the court's "sealing order," clearly impossible *as even then it had been admitted not to exist, and not witnessed or recorded if it ever did exist, and now that, too, is public record.*[6]

---

[6] There's no doubt this was to evade a First Amendment ruling: (1) the AUSA, Todd Kaminsky, admitted before the decision that the case was causing trouble "five levels above him" and DOJ did not want a First Amendment ruling; (2) the government then

And on February 3, 2011, counsel filed a Victims Rights motion with the district court, 98-CR-1101 ECF 87 which, despite Congressional mandate to do so, 18 U.S.C. §3771(d)(3), the court never took up. Counsel then sought mandamus, 11-479, which the *panel* never took up despite Congressional mandate, §3771(d)(3), that *it* do so. Yet to read the summary orders one would think no such motion or petition had been filed.

This last paragraph is the most significant in this petition as it shows one motive, not just intent, for the concealments, by the court below through unlawful sealing and by this court through elided summary order. To see why requires some background:

In 1998, Felix Sater pleaded guilty to racketeering, admitting that he, Sal Lauria, and Gennady Klotsman managed and participated in the operation of an association-in-fact RICO enterprise they ran for years to defraud stock investors of $40,000,000 by pumping and dumping stocks and launder the proceeds. Lauria and Klotsman pleaded guilty to identical charges at the same time; all became cooperators, their cases blanket "sealed" by the district court (Glasser, J.) sometime after the filing of their informations. However, as the court has admitted, and the dockets confirm, no order sealing anything was reduced to writing, docketed, or signed; no written application for such made; no transcript showing closure recorded; and no public announcement of hearing, findings capable of appellate review (in fact *no* findings, *period)* that might justify closure, made.

A year later, on March 2, 2000, the U.S. Attorney, EDNY, arrested 19 persons in part based on results of those cooperations, *U.S. v. Coppa*, 00-CR-0196, issuing a joint

---

"coaxed" Sater to try to settle the case in return for appellant's withdrawal of his First Amendment appeal; and (3) the docket of 98-CR-1101 shows the district court held *ex parte* meetings with Kaminsky and counsel for Sater for the purpose, *as stated*, of determining how appellant had made this a First Amendment issue and what to do about it.

press release with the FBI and NYPD revealing that Sater, Lauria, and Klotsman had already pleaded guilty to RICO charges. That press release, circulated around the world, was put into the Congressional record in September 2000 during testimony about organized crime's role in Wall Street fraud, and has been available online for years.

Soon after, and continuing for years until all 19 pleaded guilty, Sater's cooperation was noted in publicly filed documents and discussed in open court. The government put Sater on its public witness list in the *Coppa* proceeding against Daniel Persico, The AUSA filed a public 3500 letter on Sater, noting he was a cooperating witness, as the PACER *Coppa* docket shows. Another *Coppa* defendant, Daniel Lev, had his RICO charge reduced to harassing "government witness" Sater, publicly disclosed. Sater's status as cooperating witness was discussed in open court in 2002 before *Coppa* defendants.

Nevertheless, Sater's entire case stayed "sealed" (the quotes reflect its illegality) for no lawful reason given that his conviction *and* cooperation had been disclosed.

It stayed "sealed" past 2004, though Lauria that year published an autobiography, *The Scorpion and the Frog*, describing his and Sater's cooperation and reproducing the March 2000 press release in its preface and back cover. (Lauria's docket stayed "sealed" without lawful order, too, even after he thus publicly revealed his own cooperation.)

It stayed "sealed" past March 2009, when Lauria's docket was finally "unsealed," revealing an AUSA's 2002 letter to the court describing Sater as a convicted cooperator.

And it stayed "sealed" past October 2009, when he was sentenced *in open court,* Op. Br. at 7, Rep. Br. at 17-18, 23, making further "sealing" facially illegal.

His plea and open court sentence *should* have meant both the end of his business career and the possibility of restitution for victims of his crime (as he had to know, for

8

his cooperation agreement said he faced a sentence of $60,000,000 of restitution). Not so. Because his "sealed" case was invisible unless one knew where to look (the Congressional Record wasn't online till 2010, though in print a decade before), he was able to waste little time in resuming his old tricks, hiding assets and defrauding new victims.

By 2002, he had infiltrated and controlled Bayrock, a New York real estate venture with ties to organized crime, and used it to launder hundreds of millions of dollars, skim millions more in cash, and once again defraud his investors and business partners. For example, he caused Bayrock to apply for $1,000,000,000 or more of loans with the specific intent of defrauding those lenders by hiding his conviction from them because he knew they would not lend the money if they knew the truth, as he himself admitted in his sentencing allocution on October 23, 2009. 98-CR-1101 ECF 202 at 18.

He took title through an LLC to a $5,000,000 Fisher's Island home in 2007, days after Bayrock took in $50,000,000, and bought a $1,800,000 mansion in Sands Point in 2004 with a $1,400,000 mortgage at a time when he told the Probation Officer writing his 2004 PSR that he had no salary and a negative net worth. In truth, he was skimming $800,000 yearly in cash, booked as sham "loans" though not one dime was repaid and Bayrock's CEO and General Counsel Julius Schwarz admitted they were never *meant* to be repaid and that the company kept fraudulent books to show the IRS when needed[7].

That Sater never told this to his Probation Officer is understandable, although such concealment is a felony, indeed a RICO predicate crime. That the Officer chose

---

[7] Later, a partner at a major firm advised Bayrock and Sater to cover this by filing false returns saying Sater had been on salary since 2002 and the "loans" had been salary or advances. Though warned by the firm's head of tax that the penalty they faced if they did it could be measured in years if they were prosecuted, they did it anyway. One way or another there's felony there, fraud on the IRS, on Probation Services, or on both.

not to verify what Sater *did* tell him by not communicating with Bayrock so, as the Officer *admitted* in the PSR[8], Sater could continue to hide his conviction from the firm and his partners, isn't understandable, except that it shows the Officer's agreement not to alert the firm as part of what can only be seen as a scheme to allow Sater to defraud[9].

All in, during his tenure at Bayrock, from 2002 through at least 2008, Sater took away at least $8,000,000, possibly far more, much of it hidden inside sham trusts for his wife and children, all while awaiting sentencing and its supposedly looming restitution[10].

Only there *was* no order of restitution. Sater was sentenced on October 23, 2009, five years after he was supposed to be in 2004. By then the Crime Victims Rights Act ("CVRA") had taken effect, and this court had held it applied retroactively. Thus the government was *obligated* not only to contact the victims so Probation could make restitution recommendations, but also to tell them of any public court proceeding, *especially sentencings* because they're entitled to be heard there *and to object*. 18 U.S.C. §3771(d)(3).

This never happened. No one will say why, or discuss it. That's a problem, as the CVRA further mandates the sentencing court ensure that the government does these things. That never happened, either. No one will say why, or discuss it. *This court must.*

---

[8] The PSR contents set forth here are disclosable by SCOTUS order 6.25.12 in 12-112.

[9] Cf. Myron Gushlak, incarcerated and fined $25,000,000 for the exact same thing. He too was a cooperator who used sealing to defraud, hiding money in trust to keep it from victims to whom he knew he'd owe restitution and defrauding his partners and investors by hiding his conviction from them. At sentencing, the court granted the government's request to deny acceptance credit and issued that sentence *and* an order of $17,000,000 in restitution, as the government itself said, "a cooperation agreement is not a license to commit crime." This court affirmed. *U.S. v. Gushlak*, 495 Fed. App. 132 (CA2 2012).

[10] Hiding millions in trust from victims pre-sentencing is the thing to do among EDNY felons. Gushlak did it, and so did Roy Ageloff, a Sater confederate serving time in a federal penitentiary for money laundering for hiding the proceeds of *his* stock fraud in trusts before sentencing to keep it from victims. *U.S. v. Ageloff*, 08-CR-32 (Mid Fl. 2008).

It can't be because there are no victims. Any victim of Lauria or Klotsman must be a victim of Sater, as all admitted running the enterprise together as partners and Lauria's sentencing transcript holds his representation to the court that he had paid damages to some victims. Reply Br. 23. Klotsman was ordered to pay $40,000,000 in restitution; someone must be keeping track of that, and who has claimed against it. And all *Coppa* victims are *Sater* victims because the *Coppa* indictment names Sater, *qua* his racketeering, as an unindicted co-participant with all *Coppa* defendants in the *same scheme*, by definition probable cause to believe he's liable to them in restitution. 18 U.S.C. 3664.

But his sentencing transcript shows no *Fatico* hearing, no request by the court to hear from victims, no word from AUSA Marshal Miller, when asked was there anything to do before pronouncing sentence ($25,000 fine, no incarceration, no order of forfeiture[11], and no order of restitution). 98-CR-1101 ECF 202[12]. It shows no use of the word "victim," but many uses of the word "Sater," *because Sater was sentenced using his real name*.

How do you (1) sentence someone in open court (required, see 18 U.S.C. §3553); (2) using their real name; (3) to a crime where restitution is mandatory; (4) when victim notification is mandatory; (5) knowing there are victims; yet (6) not notify any of them and continue to hide the case afterwards? *You don't*, not legally. Here's what happened:

His sentencing never *was* in open court. In years of litigation the government and the court insisted that no public recognition of his conviction ever occurred (See Tr. Feb. 14, 2011 [AUSA Kaminsky tells the panel so; he'd have known when he'd been at

---

[11] No doubt "an accident," Sater's information omitted a forfeiture charge, so it couldn't be imposed (in *Coppa*, the same OUSA managed to remember to include the charge).

[12] One may safely presume that Miller didn't simply "forget" his duty to the victims, but rather repudiated it, *because he was at the time the EDNY Victims Rights Compliance Officer*.

the sentencing if he had been in open court].). But by March 2013, after the court had held "unsealing" but done nothing, appellant's *cert* petition must have looked dangerously likely to be granted: It had attracted amici; the Court had called for the response of the Solicitor General; and appellant was co-represented by former SG Paul Clement.

We see no other reason for the court and government to have done as they did: On March 14, 2013, the court issued a secret, undocketed, *ex parte* order, not docketed until a month later, see JA 69, which the Solicitor General sent to the Supreme Court (without telling appellant in time for him to respond). The order contained the court's statement that Sater had been sentenced in open court, which we were never meant to see, as AUSA Kamnisky wrote after he learned the SG *had* sent it to us. (Tellingly, the SG's cover letter to the Court declined to comment on or vouch for the order's truth.)

It's transparently invalid to keep secret that something occurred in open court (and illegal; *Craig v. Harney* 331 U.S. 367 (1947)); that they tried to do so makes clear the statement was fraud they didn't want known. And it's clear that the court and the government did this to convince the Supreme Court that there really had not been the illegally secret case the *cert* petition described. But by not first checking the sentencing transcript, which shows the use of Sater's real name, the court and the government put themselves in a bind because by filing that document to avoid *cert*, which was denied, they're stuck with it by estoppel unless they would confess fraud on the Supreme Court.

They chose to stick with it and made it public, the government asserting, Op. Br. 7, that Sater was sentenced in open court, making *two* judicial admissions, by the government *and* by the court, that they held an open court sentencing in a case with known victims and did *nothing* to notify them (again unless they concede fraud and obstruction).

12

You'd think the panel, to whom we presented this in detail in briefing, would have dealt with this, or at least mentioned it, as we requested. You'd be wrong. In fact, as noted, *supra*, the panel went into open defiance of the CVRA when it failed to take up appellant's 2011 petition and has adamantly remained there since, even refusing to notify the victims itself (all courts are required to notify victims, including *this* court).

The reason seems clear: All involved, arguably including the judges, are liable for conspiracy to defraud the victims by depriving them of property (their chose in action to sue for restitution) by concealment in the face of a statutory duty to disclose; or there is a hitherto unknown inherent judicial authority making it legal to defy mandatory sentencing law despite the precedents of *Ex Parte United States*, 242 U.S. 27 (1916) which held the opposite, 9-0, and *U.S. v. Dolan*, 560 U.S. 605 (2011), which confirmed that the words of the statute making restitution mandatory, 18 U.S.C. §3663A, mean exactly what they say, that the statute is the supreme law of the land above all other law. (And if there *is* such inherent judicial power, it's a *bigger* problem, as what they did here would be a judicial taking exposing the fisc to huge Fifth Amendment compensation liability.)

Liability for conspiracy to defraud may be motive for the cover-up, especially as (1) it's not limited to this case[13]; and (2) it's not limited to the sentencing, as Sater was

---

[13] Ten years ago Gushlak, Sal Romano, and Richard Appel pleaded guilty before different judges to the same securities fraud conspiracy and became cooperators. Gushlak, who used his cooperation to steal, got 7 years, $25,000,000 fine, and $17,000,000 restitution order, fn.9. Appel got 5 years, no fine, and $3,000,000 restitution order. Romano got 1 year, $300,000 forfeiture, but *no* restitution though he admitted millions in victim losse. Why? His sentencing transcript shows the AUSA told the court he'd been a good cooperator; it would be too hard to compute loss; and they didn't know who the victims were; which she accepted, sparing him restitution. So how do you explain that the government gave a list of victims and loss for Gushlak and Appel, prepared years earlier? *You don't*, except as evidence of a scheme to reward good cooperators with evasion of restitution and punish bad ones, like Klotsman (who, besides $40,000,000 of restitution,

allowed to take millions from Bayrock prior to his long-delayed sentencing, in front of Probation, and hide much of it in trusts for his family, something which has sent other cooperators who did the same thing, like Roy Ageloff, fn.10, to prison, so there's motive to hide that; and (3) as the sentencing transcript has Sater's admission he had Bayrock borrow from banks by concealing his conviction, there's motive to hide that he was allowed to get away with that, too, though admitting it in front of a federal judge, two AUSA's, and four FBI agents (which itself is another reason to believe the sentencing *wasn't* really public and *was* in any event fixed; consider, what defense attorney would let a client confess to having committed a billion dollars of bank fraud during his period of cooperation right before sentencing was imposed and risk revocation of the 5K.1?)

There's more (for reasons of space we relate summarily what was briefed): We're "here" because years ago appellant, who represented a Bayrock managing member and senior officer, was given a pack of documents[14], unsolicited, by a whistleblowing former employee who had found them on the firm computers. They revealed Sater's secret conviction, making billions of dollars of Bayrock transactions criminal fraud by the materiality of the concealment, something his client, Bayrock's former Director of Finance, naturally had personal, moral, and legal interest, indeed *duty*, in remedying.

In May 2010, after his motion to file it under seal was denied, appellant publicly filed a complaint in SDNY, *Kriss v. Bayrock*, 10-CV-3959, using parts of the documents

---

was sentenced to incarceration, which he served – so how is there no public record of his judgment, conviction or sentence – *how is someone sent to prison with no public record of how he got there?* Especially as a few items on the docket are public, show it's Klotsman's, and show his sentence? Clearly, the government and court (Glasser, J.) can't "unseal" his docket, 98-CR-1069, and transcript without explaining his sentence vs. Sater's.

[14] Sater's 2004 PSR, draft information, proffer, cooperation agreement, and criminal complaint.

to show the fraud. But instead of helping Sater's victims recover their losses and prosecuting him and others involved, two district courts swung into action to squelch public reference to Sater's secret case and punish appellant for revealing the crime. The SDNY court (Buchwald, J.) sealed the complaint (after it was online at *Courthouse News*) and the EDNY court in which Sater had been secretly prosecuted (Glasser, J.) barred appellant from disseminating the PSR and other documents the court – and later *this* court – *said* were sealed, though (1) appellant hadn't been a party to the criminal case; (2) no court could identify, *or ever has*, any actual sealing or other order that would have applied to him; (3) as the court and the government admit (i) *most of the documents never were sealed, as they had never been filed in court[15]*; and (ii) Sater was sentenced in open court using his real name, making further concealment of his case or punishing its disclosure *per se* illegal.

The government (Kaminsky) lied to the panel in February 14, 2011 argument when he denied disclosing the conviction, said harm certain and imminent if the public knew, and said only one *Coppa* defendant knew Sater was cooperating. The lies about the conviction and harm were revealed when we found the press release days later, and confirmed by the government's position now, that the sentencing was in open court. But the lie about cooperation wasn't found for years because, according to the archivists

---

[15] In the secret order filed with the Supreme Court March 2013, the court admits the cooperation and proffer weren't filed so couldn't have been sealed, though it, and the government, said the contrary for years. That's fraud repeated by the panel in its February 14 and June 29, 2011, summary orders stating that the documents appellant had been given were sealed. And in its brief the government admits the information appellant had hadn't been sealed as *it* hadn't been filed as it was a draft (and the information that *had* been filed says *it* wasn't filed under seal. ECF 1). So, besides the fact no sealing order ever existed, only two of the documents, the PSR and complaint, *could* have been sealed. And excerpts from that complaint have been public for fifteen years in the November 10, 1998 issue of *BusinessWeek*, available online (of course no one ever enjoined McGraw Hill). Years of litigation were based on fraud, on sealings that never existed.

in Lee, where the *Coppa* file was kept, the EDNY district court took it out in 2010 when this case started, didn't return it, and for years claimed not to know where it was until it "turned up" in the clerk's office in 2012 – but only after Sater's docket was unsealed.

Last, and worst: *the district court evidently engaged in a conspiracy to deprive appellants of their rights by agreeing with Mobargha and Beys, Sater's counsels, that the court would never take up our "unsealing" motions and if it did would ignore our arguments*. As shown in our Reply, that's the content of a letter they wrote May 15, 2011 warning we'd better settle as, in sum, the case was fixed. If they lied to settle, they're guilty of obstruction; but consider: the court (1) let the government withdraw *its* motion to "unseal" but hid that from us for months while failing to take up *our* continuing motions to "unseal"; (2) held secret *ex parte* merits conferences with them (and the government), fn.6; and (3) when it *did* hold hearings, *did* ignore our arguments, refusing to let us admit evidence and threatening sanctions when we did (by motion to notice the *Coppa* files) – *all consistent with their letter*.

Add their fabrication of *Coppa* co-defendant Persico's 2012 attack on Lauria and threat on Sater, which the court also sent to the Supreme Court in the secret order to justify what it had done. In a March 2011 filing the government had admitted there had never been any evidence of a threat to Sater. Perhaps they, the court, and Sater worried our argument to the Supreme Court that this circuit's law allowing concealment of cases based only on a defendant's professed fear might be struck and thought they'd get away with fraud, because by 2004 the government *and* the court knew that Persico, who supposedly said in the attack that he never knew who the cooperators were until we disclosed it, had known for a decade, from *Coppa* filings and also from Lauria's book, *supra*, which describes his cooperation against Persico. Rep. Br. 1. There's no rug big enough.

16

**WHEREFORE**, appellants pray this court grant the relief requested and set this matter for *en banc* rehearing. The undersigned certifies under penalty of perjury pursuant to 28 U.S.C. §1746 that all facts stated herein are true to the best of his knowledge. The undersigned certifies that this document complies with the typesetting rules of this court, for example that it is produced entirely in 14 point Garamond with precisely 28 points of spacing (that is, true double spacing), except in footnotes and block quotations which use precisely 14 points of spacing (that is, true single spacing).

Dated July 21, 2014 New York, New York
Dated July 28, 2014 New York, New York (further revised version by leave of clerk)


/s/ Richard E. Lerner



13-2373-cv
In re: Applications to Unseal

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

# SUMMARY ORDER

Rulings by summary order do not have precedential effect. Citation to a summary order filed on or after January 1, 2007, is permitted and is governed by Federal Rule of Appellate Procedure 32.1 and this court's Local Rule 32.1.1. When citing a summary order in a document filed with this court, a party must cite either the Federal Appendix or an electronic database (with the notation "summary order"). A party citing a summary order must serve a copy of it on any party not represented by counsel.

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 5ᵗʰ day of June, two thousand fourteen.

PRESENT:

> JOSÉ A. CABRANES,
> ROSEMARY S. POOLER,
> DENNY CHIN,
>> *Circuit Judges.*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

IN RE APPLICATIONS TO UNSEAL 98 CR 1101 (ILG),
USA V. JOHN DOE 98-CR-01101

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

LORIENTON N.A. PALMER, FREDERICK MARTIN OBERLANDER,

> *Movants-Appellants,*

> -v.-                                                     No. 13-2373-cv

JOHN DOE 98-CR-01101, UNITED STATES OF AMERICA,

> *Respondents-Appellees.*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

1

MANDATE ISSUED ON 06/05/2014

| **FOR MOVANTS-APPELLANTS:** | FREDERICK M. OBERLANDER (Richard E. Lerner, Law Office of Richard E. Lerner, P.C., New York, NY, *on the brief*), Montauk, NY. |
|---|---|
| **FOR RESPONDENTS-APPELLEES:** | EVAN M. NORRIS (Todd Kaminsky, Peter A. Norling, Elizabeth Kramer, *on the brief*), Assistant United States Attorneys, *for* Loretta E. Lynch, United States Attorney for the Eastern District of New York, Brooklyn, NY. |
| | Jason H. Berland, Beys, Stein & Morbargha LLP, New York, NY. |

Appeal from orders, entered March 15, 2013, May 15, 2013, and May 17, 2013, of the United States District Court for the Eastern District of New York (I. Leo Glasser, *Judge*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the orders of the District Court are **AFFIRMED**.

Movants seek the unsealing of certain documents relating to the cooperation of Felix Sater (formerly known publicly only as "John Doe") in a number of criminal cases. This matter has already been before us twice. *See Roe v. United States*, 428 F. App'x 60 (2d Cir. 2011); *Roe v. United States*, 414 F. App'x 327 (2d Cir. 2011). We assume the parties' familiarity with the underlying facts, procedural history, and issues for review, to which we refer only as necessary to explain our decision.

## DISCUSSION

The Supreme Court has held that judicial proceedings are presumptively open under the First Amendment. *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980). It has also recognized a common-law right of presumptive access to judicial records and documents. *See Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978). This right of access is, of course, qualified, and documents may be sealed in some cases. We have held, however, that "[d]ocuments to which the public has a qualified right of access may be sealed only if 'specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest.'" *United States v. Aref*, 533 F.3d 72, 82 (2d Cir. 2008) (quoting *Press-Enter. Co. v. Super. Ct.*, 478 U.S. 1, 13–14 (1986)). Such findings must be made "on the record for our review," but "may be entered under seal, if appropriate." *Id.* (internal quotation marks omitted).

After we last heard this case, our summary order remanded to the District Court "with instructions (i) to rule upon the government's [then-pending] unsealing motion of March 17, 2011," and "(ii) to issue a final determination regarding whether the dissemination of the other (non-PSR)

2

sealed documents in John Doe's criminal case, particularly those that refer to Doe's cooperation, should be enjoined." *Roe*, 428 F. App'x at 68–69.

That procedure was ultimately modified when the Clerk's Office in the Eastern District of New York inadvertently unsealed the docket sheet, revealing that Sater was "John Doe" and a cooperator. Judge Glasser then held a series of hearings, with only the Government and Sater's counsel present, and went through the entire docket to determine which documents should be unsealed. Thereafter, he issued two orders—one sealed, one unsealed—detailing which documents were to be kept sealed.

Movants first object that they were not allowed to attend these proceedings, although they were parties to the case. *See Aref*, 533 F.3d at 81 (holding that "a motion to intervene to assert the public's First Amendment right of access to criminal proceedings is proper"). This argument fails. Judge Glasser's sealed order is persuasive in concluding that the hearings should be closed, because the contents of the documents on their face implicate compelling interests. We have expressly held that judicial findings justifying sealing may be entered under seal. *See Aref*, 533 F.3d at 82. Moreover, it appears from the docket sheet that Movants informed the District Court of their views in written submissions. *See, e.g.*, E.D.N.Y. No. 12-mc-150, dkt. 97.

Movants next challenge the District Court's determination that a number of documents (approximately 25% of them) would remain under seal, in whole or in part. Judge Glasser's sealed order lays out the District Court's basis for ongoing sealing—generally, safety of persons or property; integrity of government investigation and law enforcement interests; and protection of cooperator's anonymity.

As a general matter, "[b]road and general findings by the trial court . . . are not sufficient to justify closure." *Matter of New York Times Co.*, 828 F.2d 110, 116 (2d Cir. 1987). And any such sealing must be narrowly tailored. *See Aref*, 533 F.3d at 82 ("[I]t is the responsibility of the district court to ensure that sealing documents to which the public has a First Amendment right is no broader than necessary.").

Here, the District Court laid out each document that was to remain sealed in a series of tables and noted for each the basis for continued sealing. Where possible, it limited the sealing to redactions on certain pages. We have reviewed the District Court's sealed order. Given the extent and gravity of Sater's cooperation, we conclude that these findings are sufficient.

## CONCLUSION

We have reviewed the record and considered plaintiffs' remaining arguments on appeal, and find them to be without merit. For the reasons set out above, we **AFFIRM** the District Court's March 15, 2013, May 15, 2013, and May 17, 2013, orders.

This panel shall retain jurisdiction over any further appeals from proceedings in the District Court.

The mandate shall issue forthwith.

FOR THE COURT,
Catherine O'Hagan Wolfe, Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

4